**Jose FLORES–CHAVEZ, Petitioner,**

**v.**

**John ASHCROFT, Attorney**

---

General,* Respondent.

No. 01–70748.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted on July 11, 2002.

Submission Vacated on Aug. 19, 2002.

Re–Argued on June 18, 2003.

Re–Submitted on March 18, 2004.

Filed March 25, 2004.

couraging him or her from considering the underlying merit of the award).

* We amend the caption to reflect that John Ashcroft, Attorney General, is the proper respondent. Fed. R.App. P. 43(c)(2). The INS ceased to exist on March 1, 2003. The clerk shall amend the docket to reflect the above caption.

Martin Resendez Guajardo, Law Office of Martin Resendez Guajardo, San Francisco, CA, for the Petitioner.

Carl H. McIntyre, Jr., United States Department of Justice, Civil Division, Washington, D.C., for the Respondent.

Lucas Guttentag, American Civil Liberties Union Foundation, Oakland, CA, amicus curiae, for the Petitioner.

Before: WARDLAW, BERZON, Circuit Judges, and ISHII, District Judge.**

## OPINION

WARDLAW, Circuit Judge:

Jose Flores–Chavez was fifteen years old when the Immigration and Naturalization Service ("INS") detained him for illegally entering the United States and then released him into the custody of an adult relative. Although the adult relative was presumed to take responsibility for Flores' appearance at his deportation hearing, *see* 8 C.F.R. §§ 242.24(b)(3)-(4) (1993),[1] the agency did not serve the adult with the Order to Show Cause ("OSC") and Notice of Hearing. Instead, the INS served only Flores with the OSC and the information specifying the date and time of Flores' upcoming hearing and his attendant rights and obligations. Flores failed to appear at the hearing and was ordered deported *in absentia.*

The Board of Immigration Appeals ("BIA") rejected Flores' claim that he did not receive proper notice, ruling that the INS was required to serve only him, and not the adult to whom he was released from custody, because he was over fourteen years of age at the time. *See* 8 C.F.R. § 103.5a(c)(2)(ii). Flores now petitions for review of the BIA's decision denying his motion to reopen his proceedings

and rescind the *in absentia* deportation order.

Construing the regulatory scheme governing juvenile notice and release as a whole, we cannot agree with the government's position that, although the regulations required the responsible adult to ensure Flores' appearance at the hearing, the INS was not required to give notice of the hearing to that adult. Because we must interpret the immigration laws to avoid serious constitutional questions, such as the due process issues implicated here, *see Zadvydas v. Davis*, 533 U.S. 678, 689, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), we hold that the only reasonable interpretation of the regulations at issue requires that the agency serve notice both to the "juvenile," as defined in 8 C.F.R. § 242.24, and to the person to whom the regulation authorizes release. We therefore grant Flores' petition for review.

## I. Facts

The facts are largely undisputed. Flores left his native El Salvador by bus on or about February 10, 1993, with plans to seek employment in New York. Flores was then fifteen years old and was accompanied by his two adult sisters. On February 17, 1993, Flores entered the United States without inspection near San Ysidro, California, and was apprehended by the INS.

The INS served upon Flores the OSC and Notice of Hearing that same day. The OSC charged him with deportability under section 241(a)(1)(B) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1251(a)(1)(B), for entry without inspec-

---

** The Honorable Anthony W. Ishii, United States District Judge for the Eastern District of California, sitting by designation.

1. This regulation was recodified at 8 C.F.R. § 236.3 on March 6, 1997, but its substantive provisions remain largely unchanged. *See* 62

Fed.Reg. 10312, 10362 (Mar. 6, 1997). Throughout this opinion, we refer to the statutes and regulations at issue as they were codified at the time of the Immigration Judge's opinion in June 1993.

tion. The information on the OSC was presented in both English and Spanish, and was read to him by the Border Patrol agent in Spanish as well. The OSC notified Flores that he was to appear for a hearing before the Office of the Immigration Judge in San Diego, California on June 30, 1993 at 9:00 a.m., and informed him of his "rights and consequences." However, Flores did not sign the form indicating he understood those rights. Although Flores was released into the care and responsibility of an adult relative,[2] the OSC and Notice of Hearing were not provided to that adult.

Because Flores had just arrived in the United States on his journey from El Salvador and had no address, the OSC and Notice of Hearing indicated in the blank adjacent to the word "address": "In transit to be provided by respondent at a later date." Upon release, Flores moved to Northern California to join his family. In early 2000, Flores was arrested on a misdemeanor assault charge and served a three-month sentence. Shortly after he returned to his home, he was apprehended by INS agents who informed him and his family that Flores had been ordered deported *in absentia* seven years earlier, in 1993. Flores was then taken into INS custody.

As it turned out, on June 30, 1993, at a hearing at which Flores was not present, Immigration Judge ("IJ") John Williams had issued an order deporting Flores, finding that he had "abandoned all claims" and that he had waived his right to appeal.

On November 8, 2000, Flores moved to reopen his deportation proceedings before the IJ and to rescind the order of deportation for lack of notice pursuant to INA § 242B(c)(1), Pub.L. 101–649, 104 Stat. 5061 (1952) (codified as amended at 8

U.S.C. § 1252b (1995)) (repealed 1996). The IJ denied Flores' motion on December 22, 2000, finding that he had received adequate notice of his hearing date. Flores timely appealed the IJ's decision to the BIA, which affirmed the IJ's decision on April 13, 2001, citing 8 C.F.R. § 103.5a(c)(2)(ii). Because Flores was fifteen when served with the OSC, the BIA reasoned that service upon him was adequate because service upon the person with whom a minor over fourteen resides was not required by regulation. The BIA also found that the INS had fulfilled its obligations under the general notice provisions of § 242B(a)(2). Thus, the BIA ruled that Flores had received "proper notice." Flores filed a timely appeal and a two-judge panel of our court stayed Flores' deportation. He remains in INS custody to this day.

## II. Jurisdiction and Standard of Review

Since Flores was placed in deportation proceedings before April 1, 1997, and his final deportation order became effective after October 30, 1996, this case is governed by the transitional rules of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. No. 104–208, 110 Stat. 3099–546 (Sept. 30, 1996). *See* IIRIRA §§ 309(a), (c)(1); *Socop–Gonzalez v. INS,* 272 F.3d 1176, 1183 (9th Cir.2001) (en banc); *Kalaw v. INS,* 133 F.3d 1147, 1150 (9th Cir.1997). We have jurisdiction pursuant to former INA § 106(a), 8 U.S.C. § 1105a(a), as modified by IIRIRA's § 309(c)(4). We review the BIA's denial of a motion to reopen for an abuse of discretion. *See Konstantinova v. INS,* 195 F.3d 528, 529 (9th Cir.1999); *Sharma v. INS,* 89

---

**2.** The record says only that Flores was released into the care of an adult relative and does not specify precisely to whom Flores was

released. We presume the INS followed its own regulations and released him to a statutorily eligible adult.

F.3d 545, 547 (9th Cir.1996). We will defer to the BIA's decision unless it "acted in a manner 'arbitrary, irrational, or contrary to law.' " *Caruncho v. INS*, 68 F.3d 356, 360 (9th Cir.1995) (internal citations omitted). We review the BIA's factual findings for substantial evidence, and its purely legal determinations de novo. *Sharma*, 89 F.3d at 547.

## III. Discussion

 Because due process requires that aliens receive notice of their deportation hearings that is reasonably calculated to reach them, *see Dobrota v. INS*, 311 F.3d 1206, 1210 (9th Cir.2002), failure to provide adequate notice is grounds for reopening deportation proceedings. *See* 8 U.S.C. § 1252b(c)(3)(A). The notice provided to secure Flores' appearance at his 1993 deportation hearing was legally insufficient. Therefore, the BIA abused its discretion in refusing to reopen Flores' deportation proceedings.

## A. General requirements of adequate notice

We first examine what generally constitutes adequate notice. The statutory provisions which govern notice of deportation proceedings are codified at INA § 242B; 8 U.S.C. § 1252b.[3] In all deportation proceedings, § 242B mandates that written notice in the form of the OSC "be given in person to the alien or by certified mail to the alien or counsel," specifying

(A) The nature of the proceedings against the alien.

(B) The legal authority under which the proceedings are conducted.

(C) The acts or conduct alleged to be in violation of law.

(D) The charges against the alien and the statutory provisions alleged to have been violated.

(E) The alien may be represented by counsel

. . . .

§ 242B(a)(1)(A)-(E).

 The statute additionally requires that

written notice shall be given to the alien . . . in the order to show cause or otherwise, of—(i) the time and place at which the proceedings will be held, and (ii) the consequences under subsection (c) of the failure, except under exceptional circumstances, to appear at such proceedings.

§ 242B(a)(2)(A)(i), (ii). The alien must also receive oral notice, in either his native language or a language he understands, of the above information. § 242B(e)(1). The OSC and any other notice given to the alien must be provided in both Spanish and English. § 242B(a)(3)(A).[4] Thus, in

---

**3.** As the legislative history of § 242B reveals, a report prepared by the General Accounting Office detailing the low numbers of potential deportees who attended their hearings was "the immediate impetus" for enacting the statute. *See* Iris Gomez, *The Consequences of Nonappearance: Interpreting New Section 242B of the Immigration and Nationality Act*, 30 San Diego L.Rev. 75, 85 (1993). The section was created against a backdrop of "immigration judges [who] were generally reluctant . . . to take action other than close cases because the aliens might not have been properly notified of the hearings." *Id.* at 86. Thus, by requiring additional notice procedures, the statute could presumably both increase the possibility of attendance at hear-

ings and satisfy judges that the due process concerns of aliens had been met.

**4.** Current law does not require that the Notice to Appear, which replaced the OSC when INA section 239 replaced section 242B, be in any language other than English. *See* INA § 239; 8 U.S.C. § 1229. Instead, the legislative history to the amendment reflects congressional intent to vest discretion for translation in the INS, which "will determine when a language other than English should be used and when the services of a translator are necessary." H.R. Conf. Rep. No. 828, 104th Cong.2d Sess. (1996), reprinted in 142 Cong. Rec. H10895 (daily ed. Sept. 24, 1996).

order to receive generally adequate notice, an alien must be informed, in a language he understands, of his rights and responsibilities in regard to .the deportation hearing, the time and place of that hearing and the consequences of failing to appear.

■ A critical safeguard was built into the provisions of § 242B in order to protect aliens who did not receive adequate notice: should the INS fail to provide the required information, an alien may file a motion to reopen "at any time if the alien demonstrates that the alien did not receive notice in accordance with subsection (a)(2) . . . ." § 242B(c)(3)(B). Therefore, if proper written notice is not provided to the alien which specifies both the time and place at which the proceedings will be held and the consequences for failing to appear at the proceedings, the *in absentia* deportation order may be rescinded. Flores argues that because proper written notice was not served upon the adult who took custody of him, he is entitled to have his deportation order rescinded.

## B. Specific requirements of adequate notice to alien juveniles

■ The BIA found that the INS had provided Flores with the notice required by § 242B. Yet, however adequate the general notice the INS provided to Flores may have been, the inquiry into the sufficiency of notice provided to Flores does not end with the question whether the form of the notice fulfilled the INS's obligations under § 242B. As an alien juvenile in INS custody, Flores was entitled to additional notice under the INA and the INS regulations to preserve his rights.

The INS's juvenile detention and release regulations expressly provide that a responsible adult assumes both custody and responsibility for a juvenile released into that adult's care. *See* 8 C.F.R. § 242.24. The regulations, which define juveniles as "alien[s] under the age of eighteen (18)

years," state that after their initial detention by the INS,

> [j]uveniles shall be released, in order of preference, to: (i) A parent; (ii) legal guardian; or (iii) adult relative (brother, sister, aunt, uncle, grandparent) who are not presently in INS detention. . . .

§ 242.24(a)-(b)(1).

The crucial need for a responsible adult is made clear by the INS's explicit delegation of responsibility to unrelated adults who take custody of juvenile aliens. The regulation states that

> [i]n unusual and compelling circumstances and in the discretion of the district director or chief patrol agent, a juvenile may be released to an adult, other than [a parent, legal guardian or adult relative not presently in INS detention] who executes an agreement to care for the juvenile's well-being and to ensure the juvenile's presence at all future proceedings before the INS or an immigration judge.

§ 242.24(b)(4). The same is true for any adult who is expressly designated by the juvenile's parent or guardian. In such cases, the adult must be designated

> in a sworn affidavit, executed before an immigration officer or consular officer, as capable and willing to care for the juvenile's well-being. Such person must execute an agreement to care for the juvenile and to ensure the juvenile's presence at all future proceedings before the Service or an immigration judge.

§ 242.24(b)(3).

The fair implication of § 242.24 as a whole is that *any* adult to whom an alien juvenile is released is charged with the dual responsibilities of caring for the juvenile and ensuring that the juvenile keeps his obligations to the court. Otherwise, the requirement that unrelated custodial adults explicitly assume responsibility for

assuring the child's appearance would place responsibilities on them that are not assumed by related custodial adults by virtue of the relationship, a distinction that would make no sense from either the child's or the INS's point of view.

■ The regulations governing release to non-related adults thus make explicit what the responsible adult release requirement implicitly recognizes: juveniles are presumed unable to appear at immigration proceedings without the assistance of an adult. As the Supreme Court noted in *Reno v. Flores,* 507 U.S. 292, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993), the explicit purpose of section 242.24 is to "protect the welfare of the juvenile." *Reno,* 507 U.S. at 311, 113 S.Ct. 1439 (internal citations omitted). Thus, when the INS releases a juvenile into a parent's or relative's custody— both to assume responsibility for the juvenile and to ensure he complies with his obligations to the court—it does so in the juvenile's interest. Without an adult who is charged with ensuring the juvenile's well-being and compliance, the juvenile is at risk of failing to keep his obligations to the court. Therefore, a legally responsible adult must be charged with ensuring the juvenile's appearance at the hearing. *See In re Gomez–Gomez,* 23 I. & N. Dec. 522, 528 (BIA 2002) ("[A]n adult relative *who receives notice on behalf of a minor alien* bears the responsibility to assure that the minor appears for the hearing, as required." (emphasis added)).

The regulatory framework which includes 8 C.F.R. § 242.24 contemplates that no minor alien under age eighteen should be presumed responsible for understanding his rights and responsibilities in preparing for and appearing at final immigration proceedings. Adoption of the INS's position would defeat the very purpose of the release provisions. It is illogical for the INS both to require the legally responsible adult to ensure the juvenile's attendance at the hearing and to withhold the notice of hearing which would enable the adult to fulfill that responsibility and to understand the consequences of a failure to do so.

Because the regulatory framework of § 242.24 assumes that a juvenile over fourteen is not competent to assure his presence at the hearing, the INS's service of the time and place of the proceedings on only Flores himself and not on the adult who took custody of him deprived Flores of the *effective* notice to which he was legally entitled under § 242B(a)(2). Given the lack of proper notice, the BIA acted "contrary to law" when it failed to reopen Flores' deportation order as required by § 242B(c)(3)(B). *Caruncho,* 68 F.3d at 360.

## C. Applicability of 8 C.F.R. § 103.5a

The INS urges us to apply the notice standard outlined in 8 C.F.R. § 103.5a, as the BIA did, as opposed to the provisions set forth in § 242.24. Section 103.5a, which governs "Service of notification, decisions, and other papers by the Service," states that "in the case of a minor under 14 years of age, service shall be made upon the person with whom the ... minor resides ...." § 103.5a(c)(2)(ii). Since Flores was fifteen at the time he was detained, the INS argues it was not required to provide notice to any person other than the minor.

As a preliminary matter, we note that our reading of § 242.24 does not conflict with the requirements of service detailed in § 103.5a. Specifically, § 103.5a(c)(2)(ii) requires service upon the person with whom a minor under fourteen resides. Nothing in the regulation precludes service to the adult with whom a minor over fourteen resides; rather, § 103.5a is silent as to how such service should be made. Thus our interpretation of § 242.24 as requiring service upon the adult to whom the minor is released does not conflict with the

language of § 103.5a; it merely reads § 103.5a to require service upon the responsible adult in a manner consistent with the INS's regulatory framework.

■ The BIA's reliance on § 103.5a is flawed for several reasons. First, as a matter of construction, we have repeatedly adhered to the "fundamental canon of statutory interpretation [which] holds that, when there is an apparent conflict between a specific provision and a more general one, the more specific one governs...." *United States v. Soberanes*, 318 F.3d 959, 963 (9th Cir.2003). Section 103.5a is a general notice provision, covering authorized means of service, the effect of service by mail, and when personal service is and is not required. § 103.5a(a)-(d). Its brief mention of how minors under fourteen should be served is part of a provision which addresses service for the mentally incompetent. § 103.5a(c)(2)(ii). Nowhere in the regulation does it purport to address the issue of notice to juveniles in custody who are released to an adult for an appearance at a future hearing.

By contrast, § 242.24 pertains specifically to the protections afforded a juvenile who is taken into INS custody and the responsibilities of the adult to whom he is released. The regulation specifically governs the "Detention and release of juveniles." It establishes a detailed framework for the release and ensuing custody of juveniles and defines the class of those entitled to the protections of the regulation

as those under the age of eighteen. § 242.24(a).

Since Flores was released into the custody of a responsible adult who was charged with providing the INS with the address at which Flores could be reached and ensuring Flores' appearance at his hearing, the INS should have followed a regulation applicable to Flores' circumstances rather than relying on a general notice regulation which addresses neither the custodial situation nor the responsibilities incumbent on the custodial adult. Following our maxim of construction, we must conclude that the specific provisions of § 242.24 apply, not the general notice provisions of § 103.5a.

The INS seems to rely upon the fact that one of its provisions regarding adolescent aliens only affords protection to those under fourteen, while not addressing the multitude of other regulations (besides § 242.24) offering protection to aliens who have not yet reached the age of eighteen. As noted above § 103.5a does not explicitly address service on children between the ages of fourteen and eighteen. In essence, the INS urges us to view Flores as a 'minor' who is above the age of fourteen, rather than a 'juvenile' who is below the age of eighteen, and who is therefore implicitly viewed by § 103.5a as sufficiently notified without any service on a responsible adult. This linguistic tightrope act cannot be sustained given the agency's interchangeable use of the terms "minor" and "juvenile" throughout its regulations.[5]

---

5. The term "minor" is never defined in INS regulations. Black's Law Dictionary acknowledges that "minor" may be synonymous with "juvenile"; it defines a "minor" as "a person who has not reached full legal age; a child or a juvenile." *Black's Law Dictionary* 1011 (7th ed.1999). In § 103.5a, the INS distinguishes minors under fourteen from those over fourteen. Yet elsewhere in the INA, under the heading "Minors" in its discussion of inadmissible aliens, the statute does not penalize an individual for time un-

lawfully present in the United States during "which an alien is under 18 years of age." 8 U.S.C. § 1182(a)(9)(B)(iii). The INS offers no explanation for the line-drawing and lack of definition in its regulations, when the statute treats all children under eighteen uniformly.

Furthermore, the INS uses the terms "juvenile" and "minor" interchangeably, even within the same sentence of a particular regulation. For example, in an INS provision governing the parole of aliens into the United States, the regulations state that "juveniles

Language regarding what exactly constitutes a "juvenile" is similarly arbitrary. In § 242.24, "a juvenile is defined as an alien under the age of eighteen (18) years." This is squarely in line with the Black's Law Dictionary definition, which specifies that a juvenile is "[a] person who has not reached the age (usu.18) at which one should be treated as an adult by the criminal justice system; minor." *Black's Law Dictionary* at 871. Yet the INS is not wedded to its definition of juvenile as one who has not turned eighteen; an alien may qualify as a "special immigrant juvenile" as long as he is under 21 years old. 8 C.F.R. § 204.11(c)(1); David B. Thronson, *Kids Will Be Kids? Reconsidering Conceptions of Children's Rights Underlying Immigration Law,* 63 Ohio St. L.J. 979, 998 n. 116 (2002). It defies logic to maintain that § 242.24, which explicitly pertains to "juveniles," is inapplicable here while a regulation that applies only to "minors" under fourteen should govern. Moreover, the text of the Federal Register which announced § 242.24 when it was implemented in 1988 specifically mentioned that "[t]he paramount concern of the INS with respect to minors in custody is the welfare of the *minor*." 53 Fed.Reg. 17449, 17450 (May 17, 1988) (emphasis added). Thus the clear objective of the provision governing detention and release of "juveniles" was to protect "minors" up until the regulation's explicitly stated limit of eighteen, even though the term "minor" never appears within the text of § 242.24.

The INS has offered no justification whatsoever for departing from its stated presumption in § 242.24 that alien juveniles under eighteen require a responsible adult to help them navigate final immigration proceedings. The INS's mysterious selection with regard to notice alone of the age of fourteen as the point at which a minor no longer needs an adult's help is particularly incomprehensible. Indeed, at age fourteen, a minor could not even drive himself to a hearing that he is required to attend, and might well be unable to navigate a public transportation system. The INS's interpretation ignores an entire statutory and regulatory framework in which "juvenile" and "minor" are used interchangeably and allows the agency to hide behind the use of the term "minor" in the context of § 103.5a when the rights of juveniles under eighteen are explicitly protected elsewhere within the INA.[6]

It would be illogical for us to determine that notice need not be served upon the responsible adult who takes custody of a minor over fourteen when the INS's own

---

may be released to a relative ... not in Service *detention who is willing to sponsor a minor and the minor may be released to that relative not withstanding that the juvenile has a relative who is in detention."* 8 C.F.R. § 212.5(b)(3)(i) (2001); Thronson, *supra,* at 998 n. 117.

**6.** We note that the government could have charged Flores with illegal entry, which is a crime under 18 U.S.C. § 1325. Flores would have thus fallen within the jurisdiction of the Federal Juvenile Delinquency Act ("FJDA") as he would have "committed [a violation of United States law] prior to his eighteenth birthday which would have been a crime if committed by an adult." *18 U.S.C. § 5031.* Had Flores been charged with a criminal

violation, under the FJDA, when he was taken into custody the arresting officer would have been required to *"immediately notify the Attorney General and the juvenile's parents, guardian or custodian of such custody."* 18 U.S.C. § 5033. Because we have previously held that *the provisions of the FJDA trump conflicting INS regulations, see United States v. Doe,* 701 F.2d 819, 823 (9th Cir.1983), the government would have been required to provide notice to Flores' parent or guardian. While the FJDA does not govern in this case, the Act's preemption of INS regulations lends further support to the idea that Congress has determined that, up until age eighteen, juveniles are presumed to require adult supervision and assistance to navigate proceedings which affect their liberty interests.

regulations would forbid the IJ from accepting that minor's admission of deportability without a responsible adult present. The agency's hearing regulations specifically provide that "[t]he special inquiry officer shall not accept an admission of deportability from an unrepresented respondent who is incompetent or under age 16 and is not accompanied by a guardian, relative or friend." [7] 8 C.F.R. § 242.16(b). Thus, had fifteen-year-old Flores attended his deportation proceedings without a guardian and conceded deportability, under INS regulations, the IJ would have been unable to accept the admission and would have been forced to "direct a hearing on the issues." § 242.16(b). The only way an IJ could have accepted an admission was if a responsible adult accompanied Flores. Were we to adopt the INS's position and find notice under § 103.5a to be adequate, we would place the INS in a bureaucratic quandry in which the person whose very presence is necessary under the regulations for an alien minor to be deported is not given notice of the hearing.

Finally, the specific facts of Flores' case also demonstrate the inapplicability of § 103.5a. The record clearly indicates that Flores had no residence in this country; even if he were under fourteen and thus entitled to have general notice served upon the person with whom he lived, he would have been unable to receive such notice as he did not live with anyone at the time he was detained. If § 103.5a is to be the sole provision which allows aliens under the age of fourteen to have a guardian served with notice, it will never be possible for the INS to properly serve a juvenile without a United States residence, and thus, it will never be possible for a juvenile alien without a residence to be deported. Surely this scenario is not what the INS envisioned when it promulgated these regulations.

### D. Due process concerns

■ Were we to uphold the INS's position that notice pursuant to § 103.5a was sufficient, due process concerns would arise. Because "[t]he private liberty interests involved in deportation proceedings are indisputably substantial," *Dillingham v. INS,* 267 F.3d 996, 1010 (9th Cir.2001), we have previously held that alien minors "in deportation proceedings are 'entitled to the fifth amendment guaranty of due process.' " *Larita–Martinez v. INS,* 220 F.3d 1092, 1095 (9th Cir.2000) (quoting *Cuadras v. INS,* 910 F.2d 567, 573 (9th Cir.1990)). Additionally, parental notification requirements, such as those established in 8 C.F.R. § 103.5a, further implicate the due process rights of juveniles, as minors generally cannot appreciate or navigate the rules of or rights surrounding final proceedings that significantly impact their liberty interests. *In re Gault,* 387 U.S. 1, 33–34, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *see also United States v. Watts,* 513 F.2d 5, 7–8 (10th Cir.1975); *Holloway v. Wainwright,* 451 F.2d 149, 151 (5th Cir. 1971); *Kemplen v. Maryland,* 428 F.2d 169, 175 (4th Cir.1970).

Given that due process interests are at stake, we look to the test outlined in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), to analyze whether the regulatory framework, interpreted as the INS urges, supplies constitutionally sufficient notice. In *Mathews,* the Supreme Court held that "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' ... interests within the meaning of the Due Process Clause of the

---

**7.** The term "special inquiry officer" is interchangeable with the term "immigration judge." *See* 8 C.F.R. § 1.1.

Fifth or Fourteenth Amendment." *Id.* at 332, 96 S.Ct. 893. In deciding what due process requires in a specific context, *Mathews* set forth a three-factor test for analyzing what procedural protections are constitutionally mandated. We must consider:

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. 893. Under *Mathews*, we balance the affected interests to see "whether the administrative procedures provided here are constitutionally sufficient." *Id.* at 334, 96 S.Ct. 893.

### 1. Affected interest of the individual

We need not belabor the point that the private interest in receiving notice of pending deportation proceedings is one of grave importance. For over one hundred years, our courts have held that aliens possess due process rights under the Fifth Amendment. *See Yamataya v. Fisher*, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903). An alien facing deportation confronts the loss of a significant liberty interest, as deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom." *Bridges v. Wixon*, 326 U.S. 135, 154, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945); *Dillingham*, 267 F.3d at 1010.

### 2. Risk of error and probable value of additional safeguards

As Flores' case demonstrates, the risk of error in the current procedures is substantial. Flores, who appears eligible to remain in the United States as a derivative on his mother's Nicaraguan and Central American Relief Act, Pub.L. No. 105–100, 111 Stat. 2160 (Nov. 19, 1997) ("NACARA") claim, never even had a chance to argue his case before the IJ since the INS failed to provide proper notice. With proper notice, Flores would in all probability have been allowed to remain in the country. Without it, he was deported *in absentia* and has been in INS custody for nearly the last four years.

In assessing the probable value of alternate or substitute procedures, we find that serving notice on the adult who takes custody of a juvenile alien is a vitally important step in ensuring that juveniles are given a meaningful chance to be heard. As the regulatory and statutory framework makes clear, juveniles require the assistance of a responsible adult to navigate the deportation process. Without that adult, the juvenile is effectively rendered unable to present a defense and, thus, his chances of remaining in the country are jeopardized. It is simply common sense that if the adult, who has agreed to assume responsibility for the juvenile's attendance, receives notice of the time, place, and rights surrounding the deportation hearing, the juvenile is far more likely to attend the hearing and to have a significant opportunity to present a case.

### 3. Governmental interest and potential burden

Finally, we look to the burden placed on the INS in requiring it to serve notice upon the adult assuming responsibility for the juvenile alien. The INS complains that notice to the responsible adult in this situation would prove too burdensome for the agency to implement. But this simply is not true. Serving notice upon the adults taking custody of minor aliens would impose, at most, a minor burden upon the government. The agency could provide

the notice when the adult arrives to take custody of the minor and could read it simultaneously to the minor and the adult. Indeed, the provision of notice to the responsible adult actually promotes efficiency; it is to the INS's great benefit to have as many juveniles as possible attend their hearings, thus avoiding the expenditures of time and money in locating those ordered deported *in absentia.* Furthermore, the incidental burden incurred by the INS is minimal when compared both with the minor's interests in understanding his rights and responsibilities and in appearing at his immigration proceedings, and with the likely effectiveness of proper notice to the responsible adult in achieving those ends.

▇▇▇ Balancing (1) the private interest that would be furthered by serving notice upon adults in these situations; (2) the risk of an erroneous deprivation of that interest through the procedures actually used in this case, and the likely value of adult notification; and (3) the government's interest, "including the function involved and the fiscal and administrative burdens that [adult notification] would entail," *Mathews,* 424 U.S. at 335, 96 S.Ct. 893, we conclude that notice to an alien juvenile in custody but not to the responsible adult into whose care he is released could raise serious constitutional due process questions. Because notice to a responsible adult is both anticipated by the regulatory structure which includes § 242.24, and required to "actually inform[ ]" an alien minor entrusted to an adult's care of his rights and obligations, *see Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 315, 70 S.Ct. 652, 94 L.Ed. 865 (1950), we must construe the juvenile release and notice regulations "if fairly possible, so as to avoid not only the conclusion that [they are] unconstitutional but also grave doubts upon that score." *Almendarez–Torres v. United States,* 523 U.S. 224, 237, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998).

**E. Application of § 103.5a to Flores' case is unreasonable**

▇▇▇ Given the due process concerns raised by the INS's interpretation of its regulations, the logic and reasonableness of applying § 242.24 as opposed to § 103.5a is apparent. Any other interpretation would raise serious constitutional questions. "[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems." *INS v. St. Cyr,* 533 U.S. 289, 299–300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (quotation marks and citation omitted); *see also Zadvydas,* 533 U.S. at 689, 121 S.Ct. 2491.

▇▇▇ Because the INS's interpretation of its regulations as not requiring notice to adults taking custody of minor aliens aged fourteen through seventeen contravenes the purpose behind the underlying regulatory framework and raises a possible due process violation, the agency's interpretation is unreasonable. As the Supreme Court held in *Chevron, Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), if the agency's

> choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.

*Id.* at 845, 104 S.Ct. 2778 (quotation marks and citation omitted). As such, *Chevron* deference is limited by the reasonableness of the agency's interpretation, and we must attempt to preserve the statute's constitutionality even if such a reading conflicts with the agency's interpretation. *See Edward J. DeBartolo Corp. v. Fla. Gulf*

*Coast Building & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (holding that if an agency's interpretation of a statute specifically entrusted to its authority "would raise serious constitutional problems," a reviewing court is obligated to construe the statute in a manner to "save the statute from unconstitutionality").

In light of the constitutional concerns, the only reasonable construction of the statute and implementing regulations requires notice to the adult to whom the juvenile is released from custody. Thus, when the INS releases a minor alien to an adult's custody pursuant to 8 C.F.R. § 242.24, thereby making that adult responsible for the minor's future appearance at immigration proceedings, the agency must serve notice of the minor's rights and responsibilities upon that adult if the minor is under eighteen. This interpretation is "reasonably calculated" to impart necessary information about deportation proceedings in a manner that will ensure the minor's appearance. *Mullane,* 339 U.S. at 314, 70 S.Ct. 652. Unlike the INS's interpretation, this reading is consistent with the "concern for the welfare of the juvenile" that is the basis for § 242.24. *See Reno,* 507 U.S. at 310, 113 S.Ct. 1439.

Furthermore, the BIA has previously explained the purpose of § 103.5a in a way which is consistent with our reading of the entire regulatory framework encompassing notice to juveniles. As the BIA recognized in *In re Mejia–Andino,* 23 I. & N. Dec. 533 (BIA 2002):

> the purpose of requiring service of a notice to appear on the person with whom a minor respondent resides [is] to direct service of the charging document "upon the person or persons who are most likely to be responsible for ensuring that an alien appears before the Immigration Court at the scheduled time."

*Id.* at 536 (quoting *In re Amaya,* 21 I. & N. Dec. 583, 585 (BIA 1996)). As the BIA itself has noted, the purpose of serving a resident adult is to ensure that the juvenile complies with his obligations to the court. *Id.* Our reading of the regulatory framework merely reconciles the INS's stated objective of bringing the juvenile before the Court with the demands that due process may well require.

## IV. Conclusion

Because Flores was not given proper notice of his deportation proceedings, the BIA acted contrary to law in failing to reopen his proceedings. Accordingly we grant the petition, order that the mandate be issued forthwith and that the Attorney General immediately release Flores from his custody.

**PETITION GRANTED.**