**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LUIS ENRIQUE SANCHEZ, AKA Enrique Cruz Sanchez, AKA Luis Llamas Sanchez, AKA Luis Charles Sanchez, AKA Enrique Sanchez Cruz, AKA Luis Enrique Sanchez Llamas, | No. 14-71768 |
| *Petitioner*, | Agency No. A076-359-028 |
| v. | OPINION |
| JEFFERSON B. SESSIONS III, Attorney General, | |
| *Respondent.* | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted March 8, 2017
Decided August 30, 2017
Opinion withdrawn July 18, 2018
Pasadena, California

Filed September 19, 2018

Before: Kim McLane Wardlaw, Richard A. Paez,
and Morgan B. Christen, Circuit Judges.

Opinion by Judge Paez;
Concurrence by Judge Paez

# SUMMARY[*]

## Immigration

The panel granted Luis Enrique Sanchez's petition for review of a decision of the Board of Immigration Appeals that affirmed an immigration judge's denial of Sanchez's motion to suppress evidence, holding that a petitioner may be entitled to termination of removal proceedings without prejudice for egregious regulatory violations.

During a fishing trip, Sanchez's boat lost power and Coast Guard officers arrived and towed the boat to Channel Islands Harbor in California. The Coast Guard detained Sanchez, and he was later taken into custody by Customs and Border Protection and placed in removal proceedings, where he unsuccessfully sought to suppress evidence of his alienage and entry into the United States.

The panel held that Sanchez had made a prima facie showing that the Coast Guard officers who detained him violated 8 C.F.R. § 287.8(b)(2), which requires that an "immigration officer" have "reasonable suspicion, based on specific articulable facts" that a person is, or is attempting to be, engaged in an offense against the United States, or is an alien illegally in the United States, in order for the immigration officer to briefly detain the person for questioning.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

As an initial matter, the panel concluded that the Coast Guard officers who detained Sanchez were acting as "immigration officers" within the meaning of the regulation. The panel explained that the Coast Guard is required by law to enforce or assist in the enforcement of all Federal laws on, under, and over the high seas and waters subject to the jurisdiction of the United States, and that when Coast Guard officers detain individuals in service of the Immigration & Nationality Act, they act as immigration agents subject to the same regulations as their counterparts in the immigration agencies.

The panel next explained that evidence may be excluded for a regulatory violation where: (1) the agency violated one of its regulations; (2) the subject regulation serves a "purpose of benefit to the alien"; and (3) the violation "prejudiced interests of the alien which were protected by the regulation." Here, the panel concluded that Sanchez had made a prima facie showing that the Coast Guard officers violated 8 C.F.R. § 287.8(b)(2), agreeing with Sanchez that he was detained solely on the basis of his race, and explaining that race and ethnicity are never grounds for reasonable suspicion. The panel also concluded that the regulation was promulgated to serve a "purpose of benefit" to petitioners like Sanchez, explaining that the regulation was intended to reflect constitutional restrictions on the ability of immigration officials to interrogate and detain persons in this country. With respect to prejudice, the panel noted that ordinarily it is the petitioner's responsibility to specifically identify prejudice, but that where, as here, compliance with the regulation is mandated by the Constitution, prejudice may be presumed.

The panel observed that a successful prima facie showing of a regulatory violation for evidentiary

suppression purposes would normally entitle petitioner to a remand for the government to rebut the petitioner's showing. However, the panel explained that this remedy was beyond Sanchez's reach because the BIA had correctly concluded, in the alternative, that Sanchez's unlawful status could be independently established through his pre-existing Family Unity Benefits and Employment Authorization applications, both of which are admissible. In this regard, the panel noted that it is well-established that the simple fact of who a defendant is cannot be excluded, and that the fruit-of-the-poisonous-tree doctrine does not extend backwards to taint evidence that existed before any official misconduct took place.

However, the panel noted that suppression was not the only available remedy, and held that petitioners may be entitled to termination of their removal proceedings without prejudice for egregious regulatory violations. The panel explained that certain kinds of pre-hearing regulatory violations can be remedied only by termination without prejudice; for this rare subset of cases, simply remanding for a new hearing or for further proceedings would be insufficient because the agency's violations predated any hearing.

Thus, the panel held that a petitioner is entitled to termination of their proceedings without prejudice where: (1) the agency violated a regulation; (2) the regulation was promulgated for the benefit of petitioners; and (3) the violation was egregious, meaning that it involved conscience-shocking conduct, deprived the petitioner of fundamental rights, or prejudiced the petitioner.

Applying this test, the panel concluded that Sanchez had made a prima facie showing of an egregious violation of 8

C.F.R. § 287.8(b)(2). The panel remanded with instructions for the agency to afford the Government an opportunity to rebut Sanchez's prima facie showing, explaining that if the Government fails to rebut Sanchez's showing that the violation was egregious, the agency shall consider whether Sanchez is entitled to termination without prejudice.

The panel also noted that Judge Pregerson had written the panel's prior opinion in this case but that, following Judge Pregerson's death, Judge Wardlaw was drawn to replace him, and the newly constituted panel withdrew the prior opinion.

Concurring, Judge Paez noted that, in the panel's prior opinion, Judge Pregerson wrote a separate concurrence expressing his frustration with the Government practice of encouraging noncitizens to apply for immigration relief, and later using that information against noncitizens in removal proceedings. Judge Paez wrote that he shared these concerns and agreed with Judge Pregerson that the Government's practice in this regard contradicts the nation's longstanding principle of welcoming immigrants into our communities.

Judge Paez quoted in full Judge Pregerson's concurrence, in which Judge Pregerson had also expressed concern about the Government's argument that the exclusionary rule does not apply to Sanchez's Family Unity Benefits and Employment Authorization applications because they predated the egregious violation. Judge Pregerson wrote that categorically exempting pre-existing applications from the exclusionary rule in this way allows law enforcement to unconstitutionally round up migrant-looking individuals, elicit their names, and then search through Government databases to discover incriminating information in pre-existing immigration records.

## COUNSEL

John Wolfgang Gehart (argued), Lourdes Barrera Haley, Elena Yampolsky, and Carlos Vellanoweth, Vellanoweth & Gehart LLP, Los Angeles, California, for Petitioner.

Tim Ramnitz (argued), Attorney; Jennifer P. Levings and Andrew C. MacLachlan, Senior Litigation Counsel; John W. Blakeley, Assistant Director; Donald E. Keener, Deputy Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

PAEZ, Circuit Judge:

As Judge Pregerson poignantly described in our prior opinion: "This case is about Luis Sanchez, a small boat owner, who took some friends on a fishing trip within United States territorial waters, and ended up in removal proceedings before an immigration judge ("IJ") under section 240 of the Immigration and Nationality Act, 8 U.S.C. § 1229a." *Sanchez v. Sessions*, 870 F.3d 901, 904 (9th Cir. 2017), *withdrawn*, 895 F.3d 1101 (9th Cir. 2018).[1]

Neither Sanchez nor his friends could have predicted the sequence of events that produced this outcome. Their plan had been to go fishing for a few hours, but after they had

---

[1] Following Judge Pregerson's death, Judge Wardlaw was drawn to replace him. The newly reconstituted panel withdrew the prior opinion. Portions of this opinion draw from Judge Pregerson's previous opinion in this case.

been out for about thirty minutes, the boat unexpectedly lost power. Stranded and with an infant on board, Sanchez's friend called for emergency assistance. Some time later, United States Coast Guard ("Coast Guard") officers arrived and towed the boat safely into Channel Islands Harbor, a recreational harbor near Oxnard, California, where Sanchez and his friends were promptly detained, frisked, and asked for identification. Although Sanchez complied and produced his driver's license, the Coast Guard continued to hold him and his friends without explanation. The Coast Guard also contacted Customs and Border Protection ("CBP") because they suspected that Sanchez and his friends were "possib[ly]" "undocumented worker[] aliens."

Sanchez was eventually taken into custody by CBP and placed in removal proceedings, where he unsuccessfully sought to suppress the Government's evidence of both his alienage and his entry into the United States without inspection as the products of Fourth Amendment and regulatory violations. Sanchez petitions for review of the agency's decision to admit the Government's evidence. We grant the petition and conclude that Sanchez has made a prima facie showing that he was seized solely on the basis of his Latino appearance, which constitutes a particularly egregious regulatory violation. We remand for further proceedings before the IJ so that the Government may rebut Sanchez's prima facie showing. We hold that the agency may consider on remand after the Government's rebuttal whether the Coast Guard officers violated 8 C.F.R. § 287.8(b)(2) and if so, whether the violation was egregious and therefore warrants terminating Sanchez's removal proceedings without prejudice.

**I.**

Sanchez is a forty-seven year old citizen of Mexico.  He was seventeen years old when he entered the United States without inspection in 1988 and has lived in this country ever since.  Until December 1, 1988, Sanchez's father was a legalized Special Agricultural Worker.  This meant that Sanchez was eligible to apply for Family Unity Benefits, a program that grants unmarried children of such legalized workers authorization to reside and work in the United States.  *See* 8 C.F.R. § 236.12(a)(1).

Sanchez submitted his Family Unity Benefits and Employment Authorization applications to the United States Citizenship and Immigration Service ("USCIS") on May 11, 2004.  Both applications were granted, with his Family Unity Benefits set to expire on May 11, 2006.  Sanchez applied for an extension in December 2008.  This time, however, USCIS denied Sanchez's applications.  USCIS concluded that he was ineligible for Family Unity Benefits and that his prior application for benefits had been approved in error, because he had previously been convicted of several California Vehicle Code violations.[2]  *See* 8 C.F.R. § 236.13(b).

As a result, Sanchez was without lawful status on February 25, 2010, the day he and his friends embarked on their ill-fated fishing trip from Channel Islands Harbor.  The

---

[2] On September 16, 1993, Sanchez was convicted of violating California Vehicle Code § 23109(c) (speeding on a highway), § 12500(a) (driving without a license), and § 40508(b) (failing to pay a court fine arising from a Vehicle Code violation).  On September 27, 1995, Sanchez was convicted of violating California Vehicle Code § 20002(a) (failing to stop a vehicle at the nearest location after an accident).  On February 8, 2008, Sanchez was convicted again of violating California Vehicle Code § 12500(a).

weather was balmy and the group planned to go fishing for approximately two hours. The trip was not meant to be particularly arduous: one of Sanchez's friends brought his fourteen-month-old son and the small recreational boat they took out to sea never made it beyond two or three miles from the harbor—well within United States territorial waters. *See* Proclamation No. 5928, 54 Fed. Reg. 777 (Jan. 9, 1989) (extending U.S. territorial waters to twelve nautical miles from the baseline).

The friends had just settled into their trip when, approximately thirty minutes after leaving the harbor, the boat's engines lost power. Unable to make their way back to shore, one of Sanchez's friends called 911 to request assistance. The 911 operator, in turn, contacted the Coast Guard for assistance. The Coast Guard proceeded to tow the boat and its occupants back to Channel Islands Harbor. The Coast Guard officers, however, did not inform Sanchez and his friends that they would be detained once they reached the shore. When Sanchez disembarked from the boat around 5:00 p.m., he was confronted by approximately eight Coast Guard officers waiting to take him into custody. The officers frisked Sanchez and his friends and then ordered them to turn over their identification documents and belongings. Sanchez complied with the officers' orders and produced his driver's license, which the officers took. Sanchez later testified at his removal hearing that the Coast Guard officers only asked him two questions while he was detained: his name and address, both of which he provided.

Understandably alarmed by the turn of events, Sanchez tried to ask the Coast Guard officers why they were detaining him. Instead of answering, the officers ordered Sanchez to stop asking questions and to stay put until "some other people" came to speak with him. What Sanchez did not

know at the time was that the Coast Guard had already contacted CBP to report "the possibility of 4 undocumented worker[] aliens" and that the officers were simply waiting for CBP agents to arrive and take custody of Sanchez.**[3]**  The CBP agents arrived approximately two hours later, at which point the Coast Guard officers allowed the group to release the infant to a relative.  CBP then transported Sanchez and his two friends, also Latino, to a facility where they were strip searched and interrogated.  The CBP officers also confiscated their identification documents.  It was during this interrogation that Sanchez admitted he had entered the United States without inspection.

The CBP officers released Sanchez later that evening and advised him to try and retain an attorney.  A CBP officer separately prepared a Form I-213 (Record of Deportable/Inadmissible Alien), which noted that CBP had been contacted after the Coast Guard officers failed to "establish positive identity or nationality" for Sanchez and his companions.  The form did not mention that Sanchez gave his driver's license to the Coast Guard, but it did note that subsequent Immigration and Naturalization Service ("INS") checks in four databases all returned "negative" results.**[4]**

Although Sanchez was released the same day he was detained, his reprieve was short lived.  The United States

---

**[3]** Sanchez's group consisted of his two friends, himself, and an infant.  The infant was a United States citizen.

**[4]** The four databases were the Automated Fingerprint Identification System, the Consular Consolidated Database, the National Crime Information Center, and the Treasury Enforcement Communications System.

Department of Homeland Security ("DHS") ultimately served him with a Notice to Appear for removal proceedings.**[5]** At the hearing, the Government sought to establish Sanchez's nationality and entry without inspection by submitting CBP's Form I-213 into evidence. Sanchez responded by filing a motion to suppress and to terminate removal proceedings. He argued that the Coast Guard egregiously violated his Fourth Amendment rights because the detention was based solely on race.**[6]** He also argued that his detention violated 8 C.F.R. § 287.8(b), which requires that officers possess "reasonable suspicion" that a person is unlawfully present in the United States before detaining her or him. Sanchez contended that the Form I-213 was therefore inadmissible and requested that the IJ terminate removal proceedings.

The IJ denied Sanchez's motion because he had failed to attach an affidavit in support of his motion; nonetheless, the IJ scheduled a suppression hearing. At the suppression hearing, which was held before a different IJ after Sanchez submitted an affidavit, the Government introduced into evidence Sanchez's 2008 Family Unity Benefits and Employment Authorization applications. Although the IJ

---

**[5]** The Notice to Appear charged Sanchez as removable under 8 U.S.C. § 1182(a)(6)(A)(i) (entry without admission or parole), § 1182(a)(2)(A)(i)(II) (conviction of a controlled substance offense), and § 1182(a)(2)(A)(i)(I) (conviction of a crime involving moral turpitude).

**[6]** Sanchez argues that the Coast Guard officers engaged in ethnic profiling by detaining him based on his Hispanic or Latino appearance. Nonetheless, because courts have "also used the language of race when discussing the relevant constitutional principles in cases involving Hispanic persons," we "refer[] to the nature of the bias as racial in keeping with the primary terminology" used by the Supreme Court. *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 863 (2017).

found that Sanchez's testimony was consistent with his affidavit, she denied his motion and ordered Sanchez removed to Mexico. In her decision, the IJ found that Sanchez had failed to establish a prima facie case of either an egregious Fourth Amendment violation or a regulatory violation. The IJ also concluded that Sanchez's Family Unity Benefits and Employment Authorization applications were separately and independently admissible to prove Sanchez's identity.

Sanchez unsuccessfully appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). In a brief, unpublished decision, the BIA concluded that even assuming the Coast Guard officers violated Sanchez's rights, the Government was entitled to rely on independent evidence—here, Sanchez's Family Unity Benefits and Employment Authorization applications—to establish his nationality and identity. The BIA therefore affirmed the IJ's decision denying Sanchez's motion to suppress and terminate removal proceedings and the IJ's removal order.

Sanchez timely petitioned us for review.

## II.

We have jurisdiction over final orders of removal pursuant to 8 U.S.C. § 1252. "Where, as here, the BIA adopts the IJ's decision while adding some of its own reasoning, we review both decisions." *Lopez-Cardona v. Holder*, 662 F.3d 1110, 1111 (9th Cir. 2011). "We review constitutional claims and questions of law *de novo*." *Id.*

## III.

It is well-established that the exclusionary rule generally does not apply to removal proceedings. *See Chuyon Yon*

*Hong v. Mukasey*, 518 F.3d 1030, 1034 (9th Cir. 2008). There are, however, two critical exceptions to this rule: (1) when the agency violates a regulation promulgated for the benefit of petitioners and that violation prejudices the petitioner's protected interests, *see id*. at 1035; and (2) when the agency egregiously violates a petitioner's Fourth Amendment rights, *see Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1018 (9th Cir. 2008). Because Sanchez has made a prima facie showing that the Coast Guard officers violated 8 C.F.R. § 287.8(b)(2) when they detained him, we do not address Sanchez's constitutional argument.

## A.

The subject regulation, 8 C.F.R. § 287.8(b)(2), states that "[i]f the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning." As an initial matter, we reject the Government's argument that the Coast Guard officers who detained Sanchez were not acting as "immigration officers" within the meaning of the regulation.

The Coast Guard is required by law to "enforce or assist in the enforcement of all applicable Federal laws on, under, and over the high seas and waters subject to the jurisdiction of the United States." 14 U.S.C. § 2(1). This includes enforcing all applicable provisions of the Immigration and Nationality Act ("INA"). *See* Gary W. Palmer, *Guarding the Coast: Alien Migrant Interdiction Operations at Sea*, 29 Conn. L. Rev. 1565, 1567, 1570 (1997) (explaining that the Coast Guard "enforce[s] compliance with the [INA] on behalf of INS and the Attorney General" (footnote omitted)). The Coast Guard is thus empowered to search, seize, and

arrest anyone "for the prevention, detection, and suppression of violations of laws of the United States" as long as the individuals in question are located within the high seas and waters over which the United States has jurisdiction. 14 U.S.C. § 89(a).

The Coast Guard's broad law enforcement powers are not, however, without restriction. Because they are tasked with "enforcing any law of the United States," including all those for which they do not have primary enforcement authority, officers of the Coast Guard are considered "agents of the particular executive department or independent establishment charged with the administration of the particular law" subject to "all the rules and regulations promulgated by such department or independent establishment with respect to the enforcement of that law." *Id.* § 89(b). In practice, 14 U.S.C. § 89(b) ensures that when—as here—Coast Guard officers detain individuals in service of the INA, they act as immigration agents subject to the same regulations as their counterparts in CBP and Immigration and Customs Enforcement ("ICE").[7] We therefore conclude that when the Coast Guard officers detained Sanchez, they were acting as "immigration officers" within the meaning of 8 C.F.R. § 287.8(b)(2).

## B.

For nearly four decades, it has been the law in our circuit that evidence may be excluded for a regulatory violation as

---

[7] Contrary to the Government's argument, it matters little that the DHS does not formally include Coast Guard officers in its non-exhaustive, regulatory definition of immigration officers. *See* 8 C.F.R. § 1.2. Lest there be any doubt, 14 U.S.C. § 89(b) declares that Coast Guard officers who act to enforce immigration laws "shall[] be deemed to be acting as agents" of the relevant immigration agency.

long as three conditions are satisfied: (1) the agency violated one of its regulations; (2) the subject regulation serves a "purpose of benefit to the alien"; and (3) the violation "prejudiced interests of the alien which were protected by the regulation." *Matter of Garcia-Flores*, 17 I. & N. Dec. 325, 328 (BIA 1980) (quoting *United States v. Calderon-Medina*, 591 F.2d 529, 532 (9th Cir. 1979)); *see also Chuyon Yon Hong*, 518 F.3d at 1035. Sanchez has made a prima facie showing that all three of these conditions have been met here.

## 1.

Section 287.8(b)(2) requires that officers possess reasonable suspicion on the basis of "specific articulable facts" that a person is unlawfully present in the country before they detain the person. The record before us is devoid of any such specific articulable facts. CBP's Form I-213 is remarkably terse in its recitation of events surrounding Sanchez's detention. The form simply states, in relevant part, that "US Coast Guard was not able to establish positive identity or nationality of the 3 adult males and 14 month infant on board the vessel" and that "US Customs and Border Protection was notified of the possibility of 4 undocumented worker[] aliens."

The narrative in the Form I-213 is troubling for two reasons. First, Sanchez consistently testified and maintained throughout his removal proceedings that he provided the Coast Guard with his driver's license when he was initially detained.[8] A valid driver's license would, of course, positively establish Sanchez's identity. Second, Sanchez

---

[8] The IJ acknowledged that Sanchez's testimony at the suppression hearing was "consistent[] with his declaration."

testified that he was *immediately* detained and met by a number of Coast Guard officers once they returned to the Channel Island Harbor.  The Government has yet to dispute the veracity of Sanchez's testimony.  Crediting both the information in the Form I-213 and Sanchez's testimony, the record indicates that the Coast Guard officers thought Sanchez was an "undocumented worker alien" before they returned to the harbor.  In other words, as the record currently stands, the officers could not have reasonably suspected Sanchez was unlawfully present in this country for lack of identification because they detained him and called CBP *before* they asked for identification and obtained Sanchez's driver's license.

On these facts, we agree with Sanchez that it appears he was detained solely on the basis of his race.  The Government has yet to offer specific and articulable facts that would support the Coast Guard officers' decision to detain Sanchez on the basis of reasonable suspicion that he was unlawfully present in this country or otherwise engaged in illegal activity.  There is no evidence, for instance, that Sanchez's boat contained contraband of any kind or that he informed the Coast Guard officers before his detention that he had entered the United States without inspection two decades ago.  Because race and ethnicity are never grounds for reasonable suspicion, we conclude that Sanchez has made a prima facie showing that the Coast Guard officers who detained him violated 8 C.F.R. § 287.8(b)(2).  *See United States v. Brignoni-Ponce*, 422 U.S. 873, 886 (1975) ("We cannot conclude that [the apparent Mexican ancestry of the occupants in a car] furnished reasonable grounds to believe that the three occupants were aliens.").

**2.**

We also conclude that 8 C.F.R. § 287.8(b)(2) was promulgated to serve a "purpose of benefit" to petitioners like Sanchez. *Calderon-Medina*, 591 F.2d at 531.

The Department of Justice ("DOJ") proposed § 287.8(b)(2)—along with a number of other regulations—to "establish enforcement standards in the areas of force, interrogation and detention not amounting to arrest." 57 Fed. Reg. 47011, 47011 (Oct. 14, 1992). The goal was to "bring immigration officers in line with other Department of Justice law enforcement officers" and to "assure the continuance of disciplined and professional conduct by Service enforcement personnel." *Id.* During the notice and comment period, a number of commenters suggested amending the proposed regulation to "include current judicial precedent defining 'reasonable suspicion' and the general authority to interrogate and detain." 59 Fed. Reg. 441093, 42411 (Aug. 17, 1994).

DOJ ultimately declined to adopt the commenters' suggestions. *See id.* DOJ explained that it would not "be appropriate to codify" current judicial precedent defining reasonable suspicion because "*binding* judicial precedent . . . is subject to revision in the ongoing process of litigation." *Id.* (emphasis added) (citing *Brewer v. Williams*, 430 U.S. 387 (1977)). DOJ thus made clear that the regulation was intended to reflect constitutional restrictions on the ability of immigration officials to interrogate and detain persons in this country—a doctrine rooted in the Fourth Amendment. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1044–45 (1984) (explaining that "the INS has its own comprehensive scheme for deterring Fourth Amendment violations by its officers," including "regulations requir[ing] that no one be detained without reasonable suspicion of illegal alienage").

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures [] shall not be violated." U.S. Const. amend. IV.  As the Supreme Court has long held, officers may not "stop and briefly detain a person for investigative purposes" under the Fourth Amendment unless they have "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).   Section 287.8(b)(2) all but parrots this standard: it provides that immigration officers may not briefly detain a person for questioning unless the officer has a "reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States."

The regulation and the Fourth Amendment standards it reflects are undoubtedly for the benefit of petitioners and not mere best-practices suggestions for immigration officers. We therefore conclude that § 287.8(b)(2) was promulgated for the benefit of petitioners like Sanchez.**[9]**

---

**[9]** Our conclusion is not affected by 8 C.F.R. § 287.12, which states that all regulations within Part 287 of the Code of Federal Regulation "do not, are not intended to, shall not be construed to, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal."

Section 287.12's bark is worse than its bite.  DOJ made clear when it first promulgated section 287.12—previously designated section 287.11—that the provision was "only intended to ensure that the regulations do not create rights not otherwise existing in law." 59 Fed. Reg. 42406, 42414 (Aug. 17, 1994).  DOJ pushed back against concerns that the disclaimer would somehow "preclude victims of unlawful Service enforcement practices from pursuing remedies for regulatory

## 3.

This brings us to the final condition that Sanchez must satisfy: prejudice. Ordinarily, it is the petitioner's responsibility to "'specifically' identify any prejudice from the violation" that potentially affected the outcome of the petitioner's removal proceeding. *Garcia-Flores*, 17 I. & N. Dec. at 328 (quoting *Calderon-Medina*, 591 F.2d at 532). But where, as here, "compliance with the regulation is mandated by the Constitution, prejudice may be presumed."[10] *Id.*; *see also Puc-Ruiz v. Holder*, 629 F.3d 771, 780 (8th Cir. 2010) ("'As a general rule, . . . prejudice will

---

violations," adding that section 287.12 would not "prevent any party from pursuing relief for alleged violations of the Constitution or laws of the United States." *Id.* The agency also clarified that section 287.12 was wholly consistent with *United States v. Caceres*, 440 U.S. 741 (1979), *see* 59 Fed. Reg. 42406, 42414, which held that "[a] court's duty to enforce an agency regulation is most evident when compliance with the regulation is *mandated by the Constitution* or federal law." *Caceres*, 440 U.S. at 749 (emphasis added); *see also Bridges v. Wixon*, 326 U.S. 135, 152–53 (1945) (invalidating a deportation order because the INS violated a regulation designed to "afford [petitioners] due process of law").

Section 287.12 thus leaves in place all regulatory rights derived from the Constitution or federal law. This necessarily includes 8 C.F.R. § 287.8(b)(2), which was promulgated to effectuate the Fourth Amendment.

[10] The regulation need not explicitly invoke the Constitution for the Constitution to mandate compliance with the regulation. *See Bridges*, 326 U.S. at 153 (concluding that a number of regulations, including one requiring statements to be signed and delivered under oath, were "designed as safeguards against essentially unfair procedures" and that the agency's failure to abide by those regulations necessitated vacating the petitioner's order of deportation); *see also Garcia-Flores*, 17 I. & N. Dec. at 328 (citing *Bridges* approvingly).

have to be specifically demonstrated,' unless compliance with the regulation is mandated by the Constitution, in which case prejudice may be presumed." (alteration in original) (quoting *Garcia Flores*, 17 I. & N. Dec. at 328)); *Martinez Camargo v. INS*, 282 F.3d 487, 492 (7th Cir. 2002) (same). Because 8 C.F.R. § 287.8(b)(2) reflects the Fourth Amendment's requirement that brief detentions be supported by reasonable suspicion, we presume that Sanchez was prejudiced by the Coast Guard officers' failure to abide by § 287.8(b)(2)'s requirements.

## C.

The BIA erroneously concluded that there was "nothing unreasonable about the Coast Guard seeking assurances that the occupants of . . . a vessel are entitled to be present in the United States before allowing them to enter the country."[11] That is not the test that applies here. The test for an alleged violation of § 287.8(b)(2) is whether the Coast Guard officers possessed reasonable suspicion that Sanchez was unlawfully present in the country when they detained him. Sanchez has made a prima facie showing that the Coast Guard officers did not.

## IV.

We turn to the heart of this case. A successful prima facie showing of a regulatory violation for evidentiary suppression purposes would normally entitle the petitioner to a remand for the government to rebut the petitioner's showing. *See Matter of Barcenas*, 19 I. & N. Dec. 609, 611

---

[11] Sanchez was seized at Channel Islands Harbor, which is not a United States port of entry. *See* 8 C.F.R. § 100.4; 19 C.F.R. §§ 101.1, 101.3. Nor is there any evidence in the record that Sanchez's boat entered United States territorial waters from international waters.

(BIA 1988) (explaining that a petitioner must establish a prima facie case for suppression "before the Service will be called on to assume the burden of justifying the manner in which it obtained the evidence"). This remedy, however, is beyond Sanchez's reach. The BIA correctly concluded in the alternative that Sanchez's unlawful status could be independently established through his Family Unity Benefits and Employment Authorization applications, both of which are admissible.[12] Put simply, the Government does not need Sanchez's Form I-213 to prove that he entered this country without inspection.

Were suppression of tainted evidence the only remedy available to Sanchez, our review—much like the BIA's—would end here. But that is not the case. In *Calderon-Medina*, we recognized that regulatory violations may invalidate deportation proceedings. *See* 591 F.2d at 531. At the time, we did not elaborate on what such an invalidation would entail. Today, we join the Second Circuit and hold

---

[12] It is well-established that "the simple fact of who a defendant is cannot be excluded, regardless of the nature of the violation leading to his identity." *United States v. Del Toro Gudino*, 376 F.3d 997, 1001 (9th Cir. 2004). Here, however, Sanchez seeks to suppress evidence that he entered the country without inspection. Accordingly, that aspect of Sanchez's Form I-213 is suppressible. Because his Family Unity Benefits and Employment Authorization applications predated the Coast Guard officers' actions, they are admissible. *See United States v. Crews*, 445 U.S. 463, 472 (1980) (concluding that evidence of the victim's identity was admissible because it "was known long before there was any official misconduct, and her presence in court [was] thus not traceable to any Fourth Amendment violation"). The fruit-of-the-poisonous-tree doctrine does not extend backwards to taint evidence that existed before any official misconduct took place. *See id.* at 475 ("The exclusionary rule enjoins the Government from benefiting from evidence it has unlawfully obtained; it does not reach backward to taint information that was in official hands prior to any illegality.").

that petitioners may be entitled to termination of their removal proceedings without prejudice for egregious regulatory violations. *See Rajah v. Mukasey*, 544 F.3d 427, 446–47 (2d Cir. 2008) (holding that pre-hearing regulatory violations may be grounds for termination without prejudice if they resulted in "prejudice that may have affected the outcome of the proceeding, conscience-shocking conduct, or a deprivation of fundamental rights"). Because Sanchez has made a prima facie showing that he was detained solely on the basis of his race and that his detention was contrary to the requirements of § 287.8(b)(2), we grant his petition for review and remand for the agency to determine in the first instance whether termination without prejudice is appropriate here.

## A.

The roots of termination without prejudice may be traced back to *Calderon-Medina*, when we first held that regulatory violations could "invalidate a deportation proceeding." 591 F.2d at 531. *Calderon-Medina* concerned criminal indictments against two defendants for illegal re-entry following deportation. *See id.* at 530. The question was whether the defendants' original deportations had been the unlawful product of a regulatory violation, such that they could not serve as a basis for the defendants' criminal indictments. *See id.* We concluded that although the INS had violated its own regulation, remand was necessary to give the defendants an opportunity to show prejudice. *See id.* at 532. Because it was impossible to invalidate the defendants' original deportations, which were carried out long before the defendants were criminally indicted for subsequent re-entry, we instructed the district court to dismiss the criminal indictments if the defendants successfully demonstrated prejudice on remand. *See id.* Put

differently, invalidating the defendants' deportation proceedings in *Calderon-Medina* meant nullifying their deportations as a legal matter for purposes of their criminal proceedings.   Our decision, however, did not limit invalidation of removal proceedings to criminal indictments.[13]

The BIA's decision in *Garcia-Flores* built upon *Calderon-Medina* and recognized that certain types of regulatory violations can "render *subsequent* agency actions invalid."  17 I. & N. Dec. at 328 (emphasis added).  This suggests that the invalidation remedy turns on *when* in the process the regulatory violation occurred.   Indeed, the Second Circuit has recognized as much.  *See Rajah*, 544 F.3d at 446–47 (distinguishing between pre-hearing regulatory violations and regulatory violations that take place during a deportation hearing).  In *Montilla v. INS*, 926 F.2d 162 (2d Cir. 1991), for example, the Second Circuit concluded that the IJ presiding over Montilla's hearing violated a regulation by failing to ask Montilla to state on the record whether he wished to procure representation. *See id.* at 169.  The court then granted Montilla's petition and remanded for a new hearing. *See id.* at 170.

*Montilla*'s remedy fits cleanly within *Garcia-Flores*'s framework for invalidating deportation proceedings: the regulatory violation took place *during* the hearing, thereby invalidating the agency's actions that took place from the hearing onwards—but, critically, not any action that took place before.  Montilla was not entitled to termination with prejudice because his initial presence in removal

---

[13] Since then, courts have invalidated removal proceedings by remanding for new hearings. *See, e.g.*, *Montilla v. INS*, 926 F.2d 162 (2d Cir. 1991).

proceedings was not the product of a disqualifying regulatory violation.  He was, however, entitled to a new hearing because the IJ's failure to properly inquire about representation at the start of his hearing rendered the hearing itself invalid.  By remanding for a new hearing, the Second Circuit effectively afforded Montilla a new hearing devoid of any of the regulatory infirmities that had taken place at the first one.

Nor is the Second Circuit the only circuit to have recognized the importance of providing petitioners with a clean slate on remand.  The Seventh Circuit emphasized in *Snajder v. INS*, 29 F.3d 1203 (7th Cir. 1994), that the agency's interference with the petitioner's regulatory right to counsel "call[s] for the prophylactic remedy of vacating the order of deportation and for writing *thereafter on a clean slate*."  *Id.* at 1207 (emphasis added) (quoting *Castaneda-Delgado v. INS*, 525 F.2d 1295, 1302 (7th Cir. 1975)).  Because the agency's actions tainted Snajder's hearing, the Seventh Circuit concluded that Snajder's case "must be remanded for a new hearing."  *Id.*

Applying our sister circuits' reasoning to this case, we agree with the Second Circuit that certain kinds of pre-hearing regulatory violations can be remedied only by termination without prejudice as opposed to a new hearing.  *See Rajah*, 544 F.3d at 446–47.  Accordingly, we conclude that a petitioner is entitled to termination of their proceedings without prejudice as long as the following requirements are satisfied: (1) the agency violated a regulation; (2) the regulation was promulgated for the benefit of petitioners; and (3) the violation was egregious, meaning that it involved conscience-shocking conduct, deprived the petitioner of fundamental rights, or prejudiced the petitioner.  *See Calderon-Medina*, 591 F.2d at 531;

*Rajah*, 544 F.3d at 447.  For this rare subset of cases, simply remanding for a new hearing or for further proceedings will be insufficient because the agency's violations predate any hearing.  Only full termination of the proceedings without prejudice can "effectively cure[] any procedural defect by putting the parties into the position they would have been had no procedural error taken place."  *Batanic v. INS*, 12 F.3d 662, 667 (7th Cir. 1993).

We emphasize that this remedy is reserved for truly egregious cases.  Termination without prejudice is undoubtedly burdensome; it effectively means that the agency must hit the reset button and begin deportation proceedings anew.  We also acknowledge that the Supreme Court has expressed particular concern with the unique costs of "releas[ing] from custody persons who would then immediately resume their commission of a crime though their continuing, unlawful presence in this country."  *Lopez-Mendoza*, 468 U.S. at 1050.  Nonetheless, we conclude that the costs of termination without prejudice do not outweigh its considerable benefits when the Government crosses the line into conscience-shocking conduct.

"Careless observance by an agency of its own administrative processes weakens its effectiveness in the eyes of the public because it exposes the possibility of favoritism and of inconsistent application of the law."  *Montilla*, 926 F.2d at 170.  This is particularly true when the agency stands accused of singling out persons for detention and deportation based on race or ethnicity.  In such circumstances, the Government cannot simply rely on the existence of untainted evidence to continue with removal proceedings that are "tainted from their roots."  *Castaneda-Delgado v. INS*, 525 F.2d 1295, 1302 (7th Cir. 1975) (quoting *United States v. Robinson*, 502 F.2d 894, 896 (7th

Cir. 1974)). To permit the Government to pick up where it left off would not only do a great disserve to petitioners, who have been subjected to conscience-shocking racial and ethnic profiling, but also remove from the table an effective tool for deterrence, specifically, termination without prejudice. *See Lopez-Mendoza*, 468 U.S. at 1043 (acknowledging the reduced "deterrent value of the exclusionary rule in a civil deportation proceeding").

## B.

Applying our test for termination without prejudice, we conclude that Sanchez has made a prima facie showing that the Coast Guard officers' violation of § 287.8(b)(2) was conscience-shocking and therefore egregious. *Cf. Omni Behavioral Health v. Miller*, 285 F.3d 646, 652 (8th Cir. 2002) ("If . . . Miller conducted his investigation in order to harass Woodlawn employees because of their race, it is possible, if not likely, that such conduct would meet the 'shock the conscience' test."). As discussed earlier, *see supra* pp. 15–16, we agree with Sanchez that the record indicates that the Coast Guard detained him on the basis of his Latino appearance.[14] The Government, to date, has offered no explanation for why Coast Guard officers contacted CBP and detained Sanchez and his companions for two hours, even after Sanchez produced his driver's license. Nor does CBP's Form I-213 shed much light on the Coast Guard officers' motivations that afternoon beyond noting

---

[14] Sanchez has also made a prima facie showing that the Coast Guard violated 8 C.F.R. § 287.8(b)(2) and that the regulation was promulgated for the benefit of petitioners. *See supra* pp. 13–20.

that the officers suspected that Sanchez and his companions were "undocumented worker[] aliens."

It is beyond question that detentions and interrogations based on racial or ethnic profiling and stereotyping egregiously violate § 287.8(b)(2)'s requirement that all detentions be based on reasonable suspicion.[15] *See, e.g.*, *Maldonado v. Holder*, 763 F.3d 155, 159 (2d Cir. 2014) (explaining that a seizure "may nevertheless qualify as an egregious violation if the stop was based on race (or some other grossly improper consideration)" (quoting *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 235 (2d Cir. 2006))). "[W]e have long regarded racial oppression as one of the most serious threats to our notion of fundamental fairness and consider reliance on the use of race or ethnicity as a shorthand for likely illegal conduct to be 'repugnant under any circumstances.'" *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1449 (9th Cir. 1994) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 571 n.1 (1976)). "[D]iscrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521 (1989) (Scalia, J., concurring). When the Government ignores this country's commitment to equality and fairness by engaging in racial and ethnic profiling, it betrays all of its people—citizens, lawful permanent residents, visitors, and migrants alike who live within its borders.

---

[15] The Government concedes in its brief that a "stop made solely on the basis of ethnicity constitutes an egregious Fourth Amendment violation." Because 8 C.F.R. § 287.8(b)(2) is premised on Fourth Amendment standards, it follows that such a stop would also egregiously violate the regulation.

We emphasize that race and ethnicity alone can never serve as the basis for reasonable suspicion. The violation alleged by Sanchez here is egregious both for its grotesque nature and its patent unlawfulness. We therefore conclude that Sanchez has made a prima facie showing of an egregious violation of 8 C.F.R. § 287.8(b)(2).[16]

## V.

When Sanchez first decided to gather his friends for a fishing trip on his boat, he could never have imagined that the short excursion would ensnare him in removal proceedings. Sanchez has since introduced evidence suggesting that the Coast Guard's decision to detain him was based on his race alone in contravention of 8 C.F.R. § 287.8(b)(2)'s requirements. Nonetheless, because the Government has not yet had an opportunity to introduce evidence rebutting Sanchez's prima facie showing that the Government egregiously violated the regulation, we grant Sanchez's petition and remand for further proceedings. On remand, the agency shall afford the Government an opportunity to rebut Sanchez's prima facie showing that there was both a regulatory violation and that the violation was egregious. If the Government fails to rebut Sanchez's showing that the violation was egregious, the agency shall consider whether Sanchez is entitled to termination without prejudice.

**PETITION FOR REVIEW GRANTED AND REMANDED.**

---

[16] Consequently, we need not consider whether the Coast Guard and CBP officers also violated other regulations.

PAEZ, Circuit Judge, concurring:

In our prior panel opinion, Judge Pregerson wrote a separate concurrence expressing his frustration with the Government practice of encouraging noncitizens to apply for immigration relief, and later using that information against noncitizens in removal proceedings. *See Sanchez v. Sessions*, 870 F.3d 901, 913–14 (9th Cir. 2017) (Pregerson, concurring), *withdrawn,* 895 F.3d 1101 (9th Cir. 2018). I share these concerns about the dilemma created by the Government's contradictory positions.

On the one hand, when the Government enacts immigration relief programs—such as driver's licenses, deferred action, and work authorization—it encourages noncitizens to apply and thereby provide the Government with personal information. *See Plyler v. Doe*, 457 U.S. 202, 220 (1982) (noting there are "significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests."). On the other hand, the Government could at a later date use that personal information against noncitizens—as was the case here with Sanchez. Maj. Op. at 21 fn.12. As a result, many noncitizens are reluctant to "com[e] out of the shadows" and "step[] into the potential net of immigration enforcement." *See* Angélica Cházaro, *Challenging the "Criminal Alien" Paradigm*, 63 UCLA L. Rev. 594, 642–43 (2016). I agree with Judge Pregerson that the Government's practice in this regard contradicts the nation's longstanding principle of welcoming immigrants into our communities.

Judge Pregerson's concurrence is quoted in full below:

> I write separately to explain why it is unfair for the Government to encourage noncitizens to apply for immigration relief,

and at a later date use statements in those relief applications against noncitizens in removal proceedings.

The Government should not be permitted to use noncitizens' applications for immigration relief to remove noncitizens from their homes and their families in our country. When the Government enacts immigration relief programs, it encourages noncitizens to apply because there are "significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests." *Plyler v. Doe*, 457 U.S. 202, 220 (1982).

The Government asks noncitizens to provide personal information to receive benefits, such as driver's licenses, visas, deferred action, and work authorization. But because noncitizens are afraid that the Government could at a later date use that information against them, many are reluctant to apply. *See* Angélica Cházaro, *Challenging the "Criminal Alien" Paradigm*, 63 UCLA L. Rev. 594, 642–43 (2016) ("Coming out of the shadows to be counted and accounted for, however, while it may bring the benefits of work authorization and a social security number, involves stepping into the potential net of immigration enforcement.").

The Government's practice in this regard contradicts the principle of welcoming immigrants into our communities. This

practice also contradicts President Kennedy's view that our nation's "[i]mmigration policy should be generous; it should be fair; it should be flexible." John Fitzgerald Kennedy, *A Nation of Immigrants* (1964). We should encourage, not punish, noncitizens who come out of the shadows seeking avenues to lawful status.

I am also concerned about the Government's argument that the exclusionary rule does not apply to Sanchez's Family Unity Benefits and Employment Authorization applications because they predate the egregious constitutional violation. *See United States v. Del Toro Gudino*, 376 F.3d 997 (9th Cir. 2004).

Categorically exempting applications that predate an egregious constitutional violation from the exclusionary rule allows immigration and other law enforcement agencies to prey on migrant and working-class communities. Law enforcement officers can unconstitutionally round up migrant-looking individuals, elicit their names, and then search through Government databases to discover incriminating information in pre-existing immigration records. *See* Eda Katharine Tinto, *Policing the Immigrant Identity*, 68 Fla. L. Rev. 819, 864 (2016).

Nothing prevents law enforcement from engaging in this unfair tactic if, as the Government contends, immigration records

that predate an egregious constitutional violation can never be the fruit of the poisonous tree. *See Elkins v. United States*, 364 U.S. 206, 217 (1960) ("[The] purpose [of the exclusionary rule] is . . . to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it."); *United States v. Olivares-Rangel*, 458 F.3d 1104, 1120 (10th Cir. 2006) ("[T]he deterrence purpose of the exclusionary rule would effectively be served only by excluding the very evidence sought to be obtained by the primary illegal behavior, not just the means used to obtain that evidence.").

This troubling end-around the exclusionary rule corrupts our justice system. The Government should not be allowed to flout the protections of the Fourth Amendment and then use a noncitizen's application for immigration relief against her or him. We should foster communication, not distrust, between migrant communities and law enforcement.

*See Sanchez*, 870 F.3d at 913–14 (Pregerson, concurring).