**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

B.R.,

*Petitioner*,

v.

MERRICK B. GARLAND, Attorney
General,

*Respondent.*

No. 19-70386

Agency No.
A200-822-829

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted February 9, 2021
San Francisco, California

Filed July 12, 2021

Before:  Kim McLane Wardlaw and Carlos T. Bea, Circuit
Judges, and Lee H. Rosenthal,* District Judge.

Opinion by Judge Bea

---

*The Honorable Lee H. Rosenthal, Chief United States District
Judge for the Southern District of Texas, sitting by designation.

## SUMMARY[**]

### Immigration

Denying in part and granting in part B.R's petition for review of a decision of the Board of Immigration Appeals, and remanding, the panel held that 1) the Department of Homeland Security properly personally served B.R with a copy of his Notice to Appear; 2) DHS cured its failure to serve the NTA on B.R.'s custodian upon his release from detention as an unaccompanied minor; 3) the immigration judge erred by failing to credit evidence showing that proof of B.R's alienage was tainted because it was obtained from his juvenile court records in violation of California privacy laws; and 4) the evidence did not compel the conclusion that B.R. was eligible for protection under the Convention Against Torture.

Addressing the issue of personal service, the panel concluded that B.R. did not overcome the presumption of proper service of his NTA. The panel explained that in the absence of clear evidence to the contrary, the court may presume that public officers properly discharge their duties, and B.R.'s declaration stating that he did not remember receiving a copy of the NTA fell far short of the evidence needed to rebut the presumption of regularity.

Turning to the issue of service on B.R's custodian, the panel observed that the parties agreed that after releasing B.R. from its custody, DHS never served the NTA on B.R.'s

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

custodian (his mother), and thus under *Flores-Chavez v. Ashcroft*, 362 F.3d 1150 (9th Cir. 2004) (requiring DHS to serve the NTA on the custodian of a minor alien after he is released), DHS's original NTA service was insufficient. The panel held that, absent a showing of prejudice, improper service of an NTA on a minor alien released from DHS custody can be cured if DHS later perfects service before substantive removal proceedings begin. The panel explained that *Flores-Chavez* does not require DHS to serve an NTA upon a minor alien's custodian at the very moment the alien is released from its custody. The panel held that DHS cured the defective service by later serving a copy of the NTA on B.R.'s counsel, consistent with then applicable regulations, after he became an adult, and before substantive proceedings had commenced. The panel further held that B.R. had not shown that he was prejudiced by the delay in service in obtaining relief from removal, and he therefore was not entitled to termination of proceedings based on his claims of DHS's regulatory violation.

The panel held that in denying B.R's motion to suppress evidence of his alienage, based on alleged regulatory and Fourth Amendment violations, the IJ erred and abused discretion by failing to credit B.R's specific evidence that DHS's evidence was tainted because it was obtained in violation of California privacy laws and his constitutional rights. To meet its initial burden of establishing alienage, DHS submitted three I-213 forms, which B.R. claimed had been created using his juvenile court records. DHS subsequently submitted two pieces of supplemental evidence of B.R.'s alienage: a birth certificate and a presentence investigation report. The IJ assumed for purposes of analysis that the information in the I-213s was obtained in violation of federal regulations or B.R.'s constitutional rights, but rather than following the normal

burden shifting framework, the IJ addressed whether the supplemental alienage evidence was obtained independently of the claimed unlawful act or of the I-213s, before B.R. moved to suppress the supplemental evidence based on taint. The panel observed that the decision preemptively to find evidence to be independent of an alleged suppressible violation may be a valid course of action in some circumstances, but if the IJ is later presented with information contrary to IJ's assumptions, the IJ is required to give that evidence reasoned consideration. Here, B.R. subsequently presented specific evidence in a motion to reconsider that at least the birth certificate was not obtained independently of tainted evidence but was itself the product of tainted evidence, namely that DHS could not have obtained the birth certificate without using at least some of the information available to DHS only in B.R.'s confidential juvenile court record.

The panel observed that nothing in the record indicated that the agency seriously considered B.R.'s evidence of taint, and that it appeared that the agency arbitrarily ignored it and found the government's evidence free from taint. The panel further noted that it was unable to conclude, based on the existing record evidence, that DHS obtained the birth certificate based on B.R.'s identity evidence alone. The panel therefore remanded with instructions to afford DHS the opportunity to rebut B.R.'s evidence of taint.

The panel noted that B.R. never satisfied his burden to submit specific evidence that DHS's presentence investigation report was tainted. Even so, the panel wrote that it had serious misgivings as to the propriety of the admission of the presentence investigation report that should be addressed on remand, including how DHS obtained the presentence investigation report when it was placed under

seal by the federal district court. Given these misgivings and the fact that the agency relied on both the birth certificate and the presentence investigation report in determining that DHS's evidence was sufficient to establish alienage, the panel refrained from concluding in the first instance that the presentence investigation report alone was sufficient to establish B.R.'s alienage.

Finally, the panel held that nothing in the record compelled the conclusion that the Mexican government would torture B.R. or acquiesce in his torture for purposes of CAT relief.

## COUNSEL

Kristen Jackson (argued), Public Counsel, Los Angeles, California; Hayley Upshaw, San Francisco Public Defender's Office, San Francisco, California; for Petitioner.

Jennifer A. Bowen (argued), Trial Attorney; Anthony C. Payne, Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Mark T. Roche, Baker & McKenzie LLP, San Francisco, California, for Amici Curiae Legal Services for Children, Children's Law Center of California, Law Foundation of Silicon Valley, and Pacific Juvenile Defender Center.

Nareeneh Sohbatian and Nimalka Wickramasekera, Winston & Strawn LLP, Los Angeles, California; Ashley A. Chung, Winston & Strawn LLP, Chicago, Illinois; for Amicus Curiae Catholic Legal Immigration Network, Inc. (Clinic).

**OPINION**

BEA, Circuit Judge:

As a minor, petitioner B.R. had multiple run-ins with the law and accumulated a lengthy juvenile court record with the State of California—a record that states he was born in Mexico. B.R. soon came to the attention of the Department of Homeland Security ("DHS"), which suspected he was not lawfully present in the United States. DHS took B.R. into custody while he was still a minor, issued him a Notice to Appear ("NTA"), and initiated removal proceedings against him. After he was released and while those proceedings were ongoing, B.R. sold methamphetamine to an undercover federal officer. He was incarcerated, and, in 2018, he was ordered removed.

B.R. now seeks review of the Board of Immigration Appeals' ("BIA") dismissal of his appeal from the Immigration Judge's ("IJ") final order of removal and denial of his application for deferral of removal under the Convention Against Torture ("CAT"). He presents three main arguments. First, he claims DHS effected improper service of the NTA, depriving the immigration court of jurisdiction, and that DHS should not have been permitted to cure that service violation. We reject and deny the claim. The IJ is permitted to allow DHS to cure defective service without terminating proceedings, provided that the alien does not demonstrate that DHS's defective service prejudiced the alien's interests. Here, DHS cured its defective service prior to any substantive removal proceedings and B.R. demonstrated no prejudice from the delay. Our holding in *Flores-Chavez v. Ashcroft*, 362 F.3d 1150 (9th Cir. 2004), does not require DHS to serve an NTA upon a minor alien's custodian at the very moment the alien is released from its custody.

Second, B.R. contends the evidence DHS submitted to support its charge that B.R. was born in Mexico should be suppressed because DHS did not obtain the evidence independently of B.R.'s confidential juvenile court records (records which he alleges DHS obtained in violation of California privacy laws and his constitutional rights). The exclusionary rule is generally not available in immigration proceedings, but we hold that once an alien makes a prima facie showing of an egregious regulatory or Fourth Amendment violation warranting suppression and submits specific evidence that the government's evidence is tainted, the government has the burden and opportunity to rebut that claim of taint. The IJ erred in failing to credit B.R.'s specific evidence of taint. We grant B.R.'s petition for review on this issue and remand for further development of the record.

Finally, B.R. argues the BIA erred in concluding he is not entitled to deferral of removal under CAT. In the interest of judicial economy, in the event DHS is able to prove B.R.'s alienage on remand, we reject now his assignments of error as to his CAT claim. The generalized country reports upon which he exclusively relies would not compel any reasonable adjudicator to conclude that the Mexican government would torture or acquiesce in his torture from the various actors he identifies.

## I. BACKGROUND

B.R., now twenty-six years old, has lived since childhood in California with his mother and siblings. As a juvenile, B.R. was arrested multiple times and accumulated a juvenile record with the State of California, a record which indicates that B.R. was born in Mexico. In 2010, while sixteen-year-old B.R. was detained on charges of possession of a concealed firearm as a minor, an Immigration and Customs Enforcement ("ICE") agent interviewed him. The

agent determined B.R. was a native and citizen of Mexico, memorializing that determination in a Form I-213 (Record of Deportable/Inadmissible Alien), which DHS used to initiate deportation proceedings.[1] B.R. insists now that he never told the ICE agent that he was born in Mexico.

On October 19, 2010, DHS detained sixteen-year-old B.R. and charged him with removability as an alien who is present in the U.S. without lawful admission or parole, pursuant to 8 U.S.C. § 1182(a)(6)(A)(i). That same day, DHS served B.R. with an NTA. B.R. signed the certificate of service but has since stated that he does not "remember" being given a copy of the NTA. On October 20, 2010, DHS filed the NTA with the Executive Office for Immigration Review ("EOIR"). B.R. was deemed an unaccompanied minor and remained in custody until he was eventually released to his mother in March 2011. Upon his release, DHS failed to serve a copy of the NTA on B.R.'s mother. In fact, DHS has never served B.R.'s mother with his NTA.

Nevertheless, in compliance with the NTA, B.R. appeared at his first removal hearing in October 2011 at the age of seventeen. It was the only removal hearing B.R. attended as a minor, and it was continued so B.R. could find counsel. Twice more, in 2012 (after he turned eighteen), B.R. appeared at removal hearings without a lawyer. Both times he was granted continuances to find counsel. No pleadings were filed, no substantive issues were addressed, and no orders of removal were entered at these hearings.

In 2013, while immigration proceedings were still ongoing, B.R. (then nineteen) sold methamphetamine to an

---

[1] DHS created three separate I-213s related to B.R., dated 2010, 2011, and 2017.

undercover federal officer. He was indicted on six federal charges of possession with intent to distribute but pleaded guilty to and was convicted only for one count of conspiracy to possess with intent to distribute methamphetamine and received a sixty-month sentence. While B.R. was in prison, he failed to appear at his removal hearing and was ordered removed *in absentia*. But in 2017, after learning B.R. had failed to appear because he was incarcerated, the IJ granted DHS's motion to reopen the proceedings.

In January 2018, B.R. (now represented by an attorney) moved to terminate proceedings on the ground that DHS failed to effectuate proper service in 2011 by failing to serve a copy of his NTA on B.R.'s custodian (his mother) when he was released to her custody, which he argued was required for minor aliens pursuant to *Flores-Chavez v. Ashcroft*, 362 F.3d 1150 (9th Cir. 2004). The IJ acknowledged that DHS's 2011 NTA service was improper under our *Flores-Chavez* rule, but denied the motion after concluding that DHS was permitted to perfect service by re-serving the NTA on then-adult B.R. The IJ noted DHS had done so by re-serving the NTA by mail on B.R.'s counsel as an attachment to the agency's response to B.R.'s motion.

In March 2018, B.R. filed a motion to suppress evidence and to terminate proceedings, in which he argued that the three I-213s that DHS had assembled and submitted as evidence of B.R.'s alienage improperly relied on B.R.'s confidential juvenile records—an act B.R. argued was a violation of his Fourth and Fifth Amendment rights and an egregious regulatory violation—and that these forms should be suppressed. B.R. argued that without the I-213s, DHS, which at that point had submitted no other evidence of his alienage, failed to meet its burden of establishing that B.R. was born in Mexico. In response to the motion, DHS

submitted two additional pieces of evidence of alienage: (1) B.R.'s Mexican birth certificate, and (2) a district court presentence investigation report which stated that B.R. was born in Mexico.[2]

On April 6, 2018, the IJ denied the motion to suppress evidence and to terminate proceedings. The IJ refrained from deciding whether DHS had acted unlawfully with respect to B.R.'s juvenile records in the preparation of the I-213s but assumed for purposes of analysis that DHS had indeed obtained information for the I-213s unlawfully. Sidestepping the merits, the IJ held that DHS's supplemental evidence (the Mexican birth certificate and the district court presentence report) was obtained based on B.R.'s identity alone, which, regardless of any alleged constitutional or regulatory violation, cannot be suppressed. Thus, the IJ found the supplementary evidence insuppressible and determined that DHS had proved B.R.'s Mexican alienage by clear, unequivocal, and convincing evidence, even without the I-213s. The IJ then dismissed B.R.'s motion to suppress the I-213s and to terminate removal proceedings as moot.

B.R. moved for reconsideration of that order, arguing that: (a) his due process rights were violated because the IJ admitted DHS's supplemental evidence without giving him adequate time to review and respond; (b) the supplemental evidence was not obtained independently of the I-213s or his state juvenile records and accordingly are tainted by the alleged constitutional violations; (c) the evidence was improperly authenticated; and (d) the presentence investigation report was sealed by the district court and

---

[2] The presentence investigation report was prepared by a probation officer in connection with B.R.'s 2013 methamphetamine conviction.

improperly obtained and submitted by DHS. The IJ considered the motion as a form of reply to DHS's response and evidence, but denied the motion to reconsider and sustained the charge of removability against B.R.

As to relief from removal, B.R. conceded he was not eligible for asylum or withholding of removal. B.R.'s only application for relief was for deferral of removal under CAT. B.R. testified before the IJ (who did not make an adverse credibility finding) that he is likely to experience future torture from a number of sources if removed to Mexico.

B.R. fears that his mother's uncle, who murdered B.R.'s father over a land dispute in Jalisco, Mexico before he was born, might torture B.R. if he returns to Mexico. B.R. also has a number of tattoos, including one visible tattoo on his neck honoring his deceased father. He claims he fears that Mexican authorities might torture him based on the erroneous assumption that these tattoos are gang related.

B.R. also fears that he may be tortured in reprisal for his sister's testimony at his cousin's criminal trial. In 2009, B.R.'s sister provided information to the police after she witnessed B.R.'s cousin commit sexual assault. The cousin avoided arrest by fleeing to Mexico where he became involved with the New Generation Jalisco Cartel, a notable drug cartel located in Jalisco, Mexico. While in Mexico, the cousin sent threatening messages to B.R. and his sister. The cousin later returned to the U.S., where he was arrested and convicted of the 2009 sexual assault, for which B.R.'s sister appeared as a witness for the prosecution. B.R. did not witness the 2009 assault and did not testify. B.R.'s cousin remains incarcerated in California state prison.

Finally, B.R. fears retribution from the drug supplier he had identified to the Drug Enforcement Agency. B.R.'s drug

supplier had bragged that his father was involved in the La Familia Michoacána drug cartel in Mexico.

On August 21, 2018, the IJ denied B.R.'s application for CAT relief and ordered B.R. removed to Mexico.[3]  The IJ found that B.R. failed to establish a likelihood that he would be tortured from the identified sources and that B.R. had also failed to show that any torture would occur by or with the consent or acquiescence of the Mexican government.

On appeal, the BIA affirmed and adopted the IJ's decisions.[4]  B.R. timely petitioned us for review of the BIA's order affirming the IJ's: (1) March 6, 2018 denial of B.R.'s motion to terminate; (2) April 6, 2018 denial of B.R.'s motion to suppress and terminate proceedings; (3) April 17, 2018 denial of B.R.'s motion to reconsider and objection to DHS's supplemental alienage evidence; and (4) August 21, 2018 denial of B.R.'s CAT claim.  We have jurisdiction to review the final order of removal under 8 U.S.C. § 1252(a)(1).[5]

---

[3] The IJ also denied B.R.'s motion to terminate in which he argued that the IJ lacked jurisdiction because the NTA failed to specify a time or place of the proceedings, citing *Pereira v. Sessions*, 138 S. Ct. 2105 (2018).  B.R. does not appeal this finding.

[4] Because the BIA adopted the IJ's decisions, we review not only the decision of the BIA, but those of the IJ as well.  *Matter of Burbano*, 20 I. & N. Dec. 872, 876 (BIA 1994).  Henceforth, we refer to the BIA and the IJ collectively as "the agency."

[5] B.R.'s unopposed motion to supplement the record (Dkt. No. 17) and motion to take judicial notice (Dkt. No. 44) are **GRANTED**.

## II. STANDARD OF REVIEW

This court reviews the agency's "purely legal determinations de novo." *Flores-Chavez*, 362 F.3d at 1155. "We review the agency's factual findings under the 'extremely deferential' substantial-evidence standard, under which we treat such findings as 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Velasquez-Gaspar v. Barr*, 976 F.3d 1062, 1064 (9th Cir. 2020) (quoting *Farah v. Ashcroft*, 348 F.3d 1153, 1156 (9th Cir. 2003); 8 U.S.C. § 1252(b)(4)(B)).

We review the denial of a motion to reconsider for abuse of discretion. *Lara-Torres v. Ashcroft*, 383 F.3d 968, 972 (9th Cir. 2004). "The BIA abuses its discretion when it acts arbitrarily, irrationally, or contrary to the law, and when it fails to provide a reasoned explanation for its actions." *Tadevosyan v. Holder*, 743 F.3d 1250, 1252–53 (9th Cir. 2014) (internal quotation marks and citations omitted).

## III. DISCUSSION

### A. NTA Service

B.R.'s first set of arguments relate to DHS's service of the NTA. He argues that: (1) DHS failed to effect proper personal service of the NTA in 2010; (2) DHS failed to effect proper service on his mother as *Flores-Chavez* requires; and (3) DHS's improper service was an egregious regulatory violation requiring termination of removal proceedings. We reject each argument in turn.

#### 1. Personal Service

B.R. claims that, despite his signature on the NTA certificate of service, DHS did not effect personal service on

him in accordance with 8 U.S.C. § 1229(a)(1) because, although he was shown the NTA, he was not given a copy of it. He further argues that an immigration court's jurisdiction over removal proceedings vests only if DHS personally serves the NTA on the alien before DHS files the NTA with the EOIR. Therefore, he argues, his proceeding should be terminated for lack of jurisdiction because DHS filed his NTA with EOIR before effecting proper personal service. We find substantial evidence supports the BIA's conclusion that DHS personally served B.R. with the NTA prior to filing it with the EOIR. We need not address his follow-on jurisdictional argument.

This court applies a presumption of regularity to the service of an NTA and will presume "[i]n the absence of clear evidence to the contrary . . . that public officers properly discharge their duties." *Kohli v. Gonzales*, 473 F.3d 1061, 1068 (9th Cir. 2007) (quotation marks and citation omitted). B.R. signed the NTA's certificate of service, and we may presume the officer then provided him with a copy. B.R. supplied no evidence to rebut this presumption beyond his own declaration, which states that he does not "remember" receiving a copy. On its own, a declaration simply refuting personal service is insufficient to overcome the presumption of regularity. *See Sembiring v. Gonzales*, 499 F.3d 981, 988–89 (9th Cir. 2007) (relying on corroborating circumstantial evidence beyond the alien's own statements to find the alien had overcome the presumption of regularity).

B.R. suggests his "unrefuted" declaration amounts to clear evidence rebutting the presumption because the government did not supply any evidence contradicting his version of events. That is not how presumptions work. The burden is on B.R. to provide "clear evidence" that

contradicts a properly invoked presumption of regularity; DHS need not respond unless or until he has done so. B.R.'s declaration falls far short of the evidence needed to rebut the presumption of regularity, and DHS's decision to rest on the presumption does not elevate an insufficient declaration to "clear evidence." Substantial evidence supports the conclusion that B.R. was properly served a copy of the NTA.

### 2. *Defective Service and Cure Under* Flores-Chavez

In *Flores-Chavez*, we construed DHS detention and release regulations to require that DHS provide additional service of an NTA on the custodians of all juvenile aliens who are released from DHS custody. 362 F.3d at 1163. In that case, DHS had served an NTA on Flores-Chavez, a fifteen-year-old alien in its custody but did not serve the NTA on the adult to whom he was later released. *Id.* at 1153. Subsequently, Flores-Chavez failed to appear at his removal proceedings and was ordered removed *in absentia*. *Id.* at 1154. The agency denied Flores-Chavez's motion to reopen proceedings based on improper service because DHS's general notice provisions required additional service only on adult custodians of minor aliens fourteen-years-old or younger. *Id.* (citing 8 C.F.R. 103.5a(c)(2)(ii) (2004), *redesignated as* 8 CFR § 103.8(c)(2)(ii)). We reversed, holding that even for minor aliens between the ages of fifteen and seventeen, if they are released from DHS to an adult's custody, DHS regulations "require[] notice to the adult to whom the juvenile is released from custody." *Id.* at 1163. We based our decision not on the general notice provisions, but on DHS's detention and release provisions, 8 C.F.R. § 242.24 (2004), *redesignated as* 8 C.F.R. § 236.3, which make the adult to whom a minor alien is released responsible for the alien's appearance before the immigration court. *Id.* On the basis that the adult custodian is the caretaker of the

minor alien, the regulation, reviewed in the light of the canon of constitutional avoidance (to avoid potential due process violations), must also require notice be served on that custodian. *Id.* at 1160–63.

Here, the parties agree that, after releasing B.R. from its custody, DHS never served the NTA on B.R.'s custodian (his mother) and that, under *Flores-Chavez*, DHS's original NTA service was thus insufficient. The dispute lies in whether this error is fatal to DHS's efforts to remove B.R. The agency deemed DHS's initial service improper but permitted DHS to re-serve the NTA on the then-adult B.R.'s attorney, curing the violation by perfecting service before any hearings were held at which substantive matters were treated. B.R. argues that the agency erred because, under *Flores-Chavez*, DHS's failure to serve B.R.'s mother at the moment he was released to her is an error that cannot be cured and permanently deprives the immigration court of jurisdiction over B.R.'s removal proceedings. Thus, he suggests, we should order the BIA "to dismiss removal proceedings for lack of jurisdiction."

Reviewing the matter de novo, we hold that improper service of an NTA on a minor alien released from DHS custody can be cured if DHS later perfects service before substantive removal proceedings begin. Therefore, whether or not DHS's improper service in 2010 deprived the immigration court of jurisdiction initially,[6] the immigration

---

[6] We have not yet directly examined whether proper service of an NTA is required for an immigration court to exercise jurisdiction. Notably, a trio of cases have held that an immigration court's jurisdiction vests upon the filing of a charging document with the EOIR, even a defective one. *See Karingithi v. Whitaker*, 913 F.3d 1158 (9th Cir. 2019); *Aguilar Fermin v. Barr*, 958 F.3d 887 (9th Cir. 2020); *United States v. Bastide-Hernandez*, 986 F.3d 1245 (9th Cir. 2021).

court had jurisdiction throughout all of B.R.'s substantive removal proceedings subsequent to DHS's perfection of service on B.R. in 2018.

Before addressing B.R.'s *Flores-Chavez* argument, we hold as a general matter that, absent a showing of prejudice, improper service of an NTA can be cured and is not fatal. The statute does not require notice to be provided at any particular moment.  Instead, the statute states only that: "In removal proceedings under section 1229a of this title, written notice (in this section referred to as a 'notice to appear') shall be given in person to the alien . . . ."  8 U.S.C. § 1229(a)(1).  The regulations also require service on the alien.  8 C.F.R. § 1003.14(a) (When DHS files an NTA with the EOIR, it is required to "include a certificate showing service on the opposing party pursuant to § 1003.32.").  Section 1003.32(a) does require "simultaneous[]" service for documents filed with the immigration court, including the NTA.  But nothing in the statute or regulations requires termination of removal proceedings solely because the initial service was found to be defective.

B.R. concedes as well that we have "not yet held that improper NTA service requires termination of removal proceedings."  Indeed, we have not.  But we have considered the similar issue of the service of a defective NTA (as opposed to improper service of an otherwise valid NTA) and came to a conclusion opposite to the one B.R. proposes here. In *Aguilar Fermin v. Barr*, we held that the remedy for service of a defective NTA is to provide DHS an opportunity to cure the defect in the NTA rather than to order termination of removal proceedings.  958 F.3d 887 (9th Cir. 2020). There, DHS had served the petitioner with an NTA that was missing the location where her proceedings were to take place—information required for the NTA to be valid under

8 C.F.R. §1003.15(b)(6). *Id.* at 893–94. We agreed with the BIA's interpretation of the regulation and concluded that the "appropriate remedy" for service of the defective NTA was for DHS to provide the alien "with the complete notice at a later time." *Id.* at 895. In other words, service of a defective NTA "can be cured and is not fatal." *Id.* Given no statutory or regulatory provision requires otherwise, we think it logically proceeds that the remedy for improper service of an NTA is for proper service to be provided at a later time, provided the alien is not prejudiced by the delay.

In holding that defective service may be cured absent prejudice, we align ourselves with the BIA, which has already concluded that the remedy for improper service of an NTA is generally to postpone proceedings until DHS is able to perfect and cure defective service. In *Matter of W-A-F-C-*, the IJ terminated proceedings after DHS had failed to serve the NTA on the person with whom the minor alien resided in accordance with the regulatory requirements for serving minors under the age of fourteen. 26 I. & N. Dec. 880, 880 (BIA 2016). The BIA reversed, holding that when DHS makes an effort to re-serve, "DHS should be given an opportunity to effect proper service" without termination of proceedings.[7] *Id.* at 882. *Matter of W-A-F-C-* built on a prior BIA holding in *Matter of E-S-I-*, where, despite indicia that the alien was incompetent, DHS failed to serve the alien in accordance with the regulatory requirements for

---

[7] In so holding, the BIA distinguished one of its earlier cases, *Matter of Mejia-Andino*, where it affirmed an IJ's termination of proceedings after DHS never attempted to cure service of a seven-year-old who had failed to appear at two hearings. *Id.* at 882 (citing *Matter of Mejia-Andino*, 23 I. & N. Dec. 533, 535–37 (BIA 2002)). B.R.'s reliance on *Matter of Mejia-Andino* is misplaced because here, as in *Matter of W-A-F-C-*, DHS did attempt and did complete a cure of service, and B.R. did appear at his hearings. *Id.*

incompetents. 26 I. & N. Dec. 136, 145–46 (BIA 2013). Rather than require termination of proceedings, the BIA remanded and ordered that the IJ "grant a continuance to give the DHS time to effect proper service." *Id*.

We look to the statute and regulations to determine DHS's obligations. We see no reason to burden the government's efforts in enforcing immigration laws by judicially mandating service of charging documents on all aliens be perfect on the very first attempt absent statutory or regulatory language so requiring. As written, the function of the service requirement is to provide notice to the alien of his removal proceedings, not to interminably delay proceedings with unnecessary, do-or-die procedural hurdles. Provided the government is able to serve notice on the alien prior to a hearing on substantive matters, that function is served, whether it occurs on the first attempt or by subsequent cure.

But regardless whether service may be cured generally, B.R. argues a different rule exists for minors released from DHS custody. B.R. claims that under our holding in *Flores-Chavez*, DHS is required to effect proper service *at the time a minor is released* and may not cure defective service at some later time or date. To support that contention, B.R. relies on this phrase from our opinion:

> *[W]hen* [DHS] releases a minor alien to an adult's custody pursuant to 8 C.F.R. § [236.3], thereby making that adult responsible for the minor's future appearance at immigration proceedings, the agency must serve notice of the minor's rights and responsibilities upon that adult if the minor is under eighteen.

*Flores-Chavez*, 362 F.3d at 1163 (emphasis added). Thus, he argues, we established a temporal limitation that requires proper service the moment the minor is released, and that a failure to do so cannot ever be cured.

B.R. misreads our opinion. In that passage we used the word "when" as a preface to a condition, not as a temporal requirement on service. Our analysis in *Flores-Chavez* spends considerable time differentiating the general service requirements for minor aliens under § 103.8 from the specific provision discussing the release of minors from custody under § 236.3, concluding: "§ [236.3] pertains specifically to the protections afforded a juvenile who is taken into [DHS] custody and the responsibilities of the adult to whom he is released." *Id.* at 1158. "[W]hen," in the context we used it in *Flores-Chavez*, means "if" or "on the occasion of." The opinion distinguished between minors generally and those minors released to an adult's custody. In other words, service on a minor alien's guardian is required only "if" the minor alien is released from DHS custody, not "upon the moment" of his being released. *See Cruz Pleitez v. Barr,* 938 F.3d 1141, 1146 (9th Cir. 2019) (distinguishing *Flores-Chavez* in holding that DHS need not serve an NTA on the guardian of a minor over the age of fourteen when DHS never detained or released the minor from custody). *Flores-Chavez* requires DHS to serve the NTA on the custodian of a minor alien after he is released. It does not create a bizarre rule where, if service on the custodian is not made the instant the minor is released, DHS is barred from pursuing removal.

B.R. also forwards a public policy argument: that unless we require DHS to serve the guardian at the moment of release, DHS could strategically delay service to the guardian to circumvent the special protections for minors

described in *Flores-Chavez*. We are not persuaded. These notice protections exist to place minors on equal footing with adults. *See Flores-Chavez*, 362 F.3d at 1157, 1160. Once an adult, an alien no longer needs such protections. Indeed, absent some type of disability, physical or mental, an adult alien is in a better situation to protect his own interests than a minor alien, who must rely on third parties or guardians. Even if we were swayed by B.R.'s public policy arguments, DHS could simply delay service of an NTA and commence removal proceedings once the alien turns eighteen. *See Cortez-Felipe v. INS*, 245 F.3d 1054, 1057 (9th Cir. 2001) (DHS has unreviewable "discretion regarding when and whether to initiate deportation proceedings."). In contrast, we are much more wary of following B.R.'s reasoning, where even a day's delay in service would grant the minor alien permanent immunity from removal.

To cure defective service, DHS re-served the NTA on then-adult B.R., but B.R. here complains that DHS again did not serve notice on B.R.'s mother. We hold that DHS need not have served B.R.'s mother after he turned eighteen and that DHS properly perfected service by mailing the NTA to B.R.'s attorney.[8] Once B.R. turned eighteen, he was no longer entitled to the protections of *Flores-Chavez*, which are premised on the idea that "no minor alien under age eighteen should be presumed responsible for understanding his rights and responsibilities in preparing for and appearing at final immigration proceedings." 362 F.3d at 1157. Re-service should conform to the DHS regulations that apply to the alien at the time of the service. Here, DHS re-served the

---

[8] Service by mail on an adult alien's attorney qualifies as proper service. 8 C.F.R. § 103.8(a)(1)(i).

NTA on B.R. prior to any substantive proceedings before the IJ and so corrected its prior improper service.

In sum, we hold that IJs do have authority to allow DHS to cure improper service of an NTA without requiring termination of proceedings, that *Flores-Chavez* did not create a temporal requirement that DHS serve a minor alien's custodian immediately upon release, and that DHS did properly perfect service on B.R. here. The immigration court had jurisdiction over B.R.'s removal proceedings.

### 3. Whether B.R. Is Entitled to Termination of Proceedings as a Result of a Prejudicial Regulatory Violation

In holding that DHS may cure defective service to avoid violating § 1229 and related regulations, we do not suggest that there is no remedy when improper service amounts to an egregious regulatory violation which works to prejudice an alien's interests. Our test from *Sanchez v. Sessions* provides adequate remedy of such instances: "[A] petitioner is entitled to termination of their [sic] proceedings without prejudice as long as the following requirements are satisfied: (1) the agency violated a regulation; (2) the regulation was promulgated for the benefit of petitioners; and (3) the violation was egregious, meaning that it involved conscience-shocking conduct, deprived the petitioner of fundamental rights, or prejudiced the petitioner." 904 F.3d 643, 655 (9th Cir. 2018).

B.R. argues that, even if DHS is permitted to cure defective service, its initial failure to serve B.R.'s mother in accordance with *Flores-Chavez*'s interpretation of 8 C.F.R. § 236.3 and the seven-year gap between its initial failure and its perfection in 2018 were egregious regulatory violations that prejudiced his interests, requiring termination of his

removal proceedings.[9]   It is clear enough that the notice requirement was intended to benefit B.R. and that by compelling B.R. to appear for removal proceedings without serving B.R.'s mother with his notice to appear, DHS initially violated § 236.3.  *See Flores-Chavez*, 362 F.3d at 1157.

It is not at all clear that DHS's violation prejudiced B.R. Let us compare *Flores-Chavez*, where DHS failed to serve the NTA on minor-alien Flores-Chavez's custodian upon release, which led to Flores-Chavez's subsequent failure to appear at his hearing.  362 F.3d at 1154.  The IJ found Flores-Chavez to have abandoned all claims and waived his right to appeal and ordered him removed *in absentia*.  *Id.*  We held DHS failed to serve a notice to appear upon Flores-Chavez properly, reversed, and ordered BIA to reopen proceedings, reasoning that Flores-Chavez "never even had a chance to argue his case before the IJ since [DHS] failed to provide proper notice."  *Id.* at 1161.

B.R., by contrast, suffered no similar prejudice.  Unlike Flores-Chavez, B.R. did appear at his first hearing, the only hearing that occurred while he was under the age of eighteen. That hearing was continued to allow B.R. to find an attorney, which he eventually did.  Nothing substantive occurred in B.R.'s removal proceedings between DHS's initial improper service in 2011 and DHS's cure by re-service in 2018.  B.R. subsequently had the chance to argue his case before the IJ, as well as the BIA and the Ninth Circuit.  Unlike in *Flores-*

---

[9] B.R. suggests the agency "ignored" this argument and that we should remand.  We disagree.  The agency impliedly rejected B.R.'s argument in finding DHS had cured the alleged regulatory violation under *Flores-Chavez*.  Moreover, we follow our precedent in *Sanchez* in examining whether a petitioner has made out a prima facie case of an egregious regulatory violation.  *See* 904 F.3d at 653–56.

*Chavez*, lack of notice prior to cure did not affect the merits of the case: each of B.R.'s arguments and claims for relief have been fully litigated.

In *Sanchez,* we explained that the purpose of "full termination of the proceedings without prejudice" is to "cure[] any procedural defect by putting the parties into the position they would have been had no procedural error taken place." *Sanchez*, 904 F.3d at 655 (internal quotation marks and citation omitted). Here, B.R. is already in the same position he would be if we were to grant termination without prejudice. Were we to order remand and cure, DHS would be required only to again re-serve the same NTA on B.R., who would again be limited to the same theories of relief.

B.R. suggests that if he had been properly served as a minor, his guardian would have better been able to take advantage of time-sensitive relief (such as asylum's one-year application period) or relief available only to minors (such as Special Immigrant Juvenile Status ("SIJS")). True enough, we have said "no minor alien under age eighteen should be presumed responsible for understanding his rights and responsibilities in preparing for and appearing at final immigration proceedings." *Flores-Chavez*, 362 F.3d at 1157. But B.R. struggles to establish prejudice even under this hypothetical.

Eligibility for asylum and SIJS is not contingent on receipt of an NTA. It is the responsibility of the alien or his guardian independently to seek and timely apply for asylum relief, not to wait for the commencement of removal proceedings. *See* 8 U.S.C. § 1158(a)(1), (a)(2)(B); *Al Ramahi v. Holder*, 725 F.3d 1133, 1139 (9th Cir. 2013) (the responsibility to submit a timely asylum application exists regardless of when the alien is issued an NTA). Moreover, B.R. has already conceded he is not eligible for asylum,

having committed a particularly serious crime. *See* 8 U.S.C. § 1158(b)(2)(A)(ii).

Nor was it possible for B.R. to be prejudiced in the attainment of SIJS. Under *Flores-Chavez* and § 236.3, an alien is due additional notice to his guardian only up until the age of eighteen, after which he is considered capable of personally understanding his rights and responsibilities as communicated in the NTA. Yet aliens up to the age of twenty-one remain eligible to apply for SIJS. 8 C.F.R. § 204.11(c)(1). Thus, even after a minor alien ages out of additional notice protections from *Flores-Chavez*, he remains eligible to apply for SIJS for three more years. B.R. himself appeared at two immigration hearings while he was over the age of eighteen and under twenty-one and did not request SIJS. He had three years to apply for SIJS as an adult but failed to do so.[10]

All substantive hearings, pleadings, and orders occurred after service on B.R. was perfected. B.R. has not shown he was prejudiced by the delay in service in obtaining relief from removal. B.R. is not entitled to termination based on his claims of DHS's regulatory violation. We deny his

---

[10] We also note that seeking the juvenile court order necessary for SIJS for the primary purpose of obtaining immigration relief is not permitted: "In order to consent to the grant of SIJ classification, USCIS must review the juvenile court order and any supporting evidence submitted to conclude that the request for SIJ classification is bona fide, which means that the juvenile court order was sought to protect the child and provide relief from abuse, neglect, abandonment, or a similar basis under state law, and ***not primarily to obtain an immigration benefit***." 6 USCIS Policy Manual, pt. J, ch. 2(D) (emphasis added). *See also* U.S. Citizenship and Immigration Services, Policy Memorandum (Oct. 11, 2019), https://www.uscis.gov/sites/default/files/document/memos/Matter_of_D-Y-S-C-_Adopted_Decision_2019-02_AAO_Oct._11_2019.pdf.

petition for review for all arguments related to service of the NTA.

## B.  Evidence of Alienage

B.R.'s second main argument is levied against the evidence that DHS submitted to prove B.R.'s alienage.  DHS has the burden of proving alienage by "clear and convincing evidence."  8 C.F.R. § 1240.8(a).  To meet that burden here, DHS initially submitted three I-213 forms to establish B.R.'s alienage.  But before the IJ, B.R. moved to suppress these forms, claiming DHS had created them using B.R.'s juvenile court records, in violation of California privacy laws and B.R.'s constitutional rights.  In response, rather than join issue on the provenance of the birth and citizenship facts contained in the I-213s by submission of evidence as to how DHS had procured such information, DHS submitted two pieces of supplemental evidence of B.R.'s alienage.  The first item was B.R.'s Mexican birth certificate indicating he was born in Jalisco, Mexico.  Alongside the birth certificate, DHS submitted a certification signed by an ICE agent stating he had obtained B.R.'s birth certificate "through the publicly available archives portal on the Consulate General of Mexico website by inputting [B.R.]'s biographical information."   The second item was a presentence investigation report created after B.R.'s 2014 federal methamphetamine conviction at age nineteen.  Unlike with the birth certificate, DHS provided no explanation for how it obtained the presentence investigation report.

To resolve this motion to suppress, the IJ first assumed B.R. made out a prima facie case that the three I-213s were suppressible due to DHS's alleged unlawful actions.  The IJ then observed that "identity evidence is never suppressible in civil removal proceedings."  Finally, the IJ concluded that, even under the assumption that the I-213s were suppressible,

DHS had located and submitted B.R.'s birth certificate and presentence investigation report using only B.R.'s identity information, making the documents independent evidence of B.R.'s alienage.

B.R. filed a motion to reconsider and objected to the new evidence, claiming that he was not granted sufficient time to review and respond and that DHS did not demonstrate that the supplemental alienage evidence was obtained independently of the alleged violation. B.R. presented new uncontested evidence that suggested that more than just his name was necessary to obtain a certified copy of his Mexican birth certificate—the ICE agent would also have needed his date of birth, names of his parents, or a unique population identification code. The IJ stated it would consider the motion to reconsider "to be a form of response" to the underlying motion to suppress, but denied the motion, finding the original order did not contain any errors of law or fact.

Because the IJ treated the motion to reconsider as part of the original briefing, we are presented with a somewhat murky question as to our standard of review. We could arguably review de novo the IJ's order denying reconsideration alongside the order permitting DHS's supplemental evidence. *See Martinez-Medina v. Holder*, 673 F.3d 1029, 1033 (9th Cir. 2011) ("We review de novo the denial of a motion to suppress."). We could also review under the abuse of discretion proper for motions to reconsider. *Lara-Torres*, 383 F.3d at 972. Here, since we find against the government under either standard, we will employ the abuse of discretion standard, which is more favorable to its position.

"As a general matter, the Fourth Amendment's exclusionary rule does not apply to immigration

proceedings." *Perez Cruz v. Barr*, 926 F.3d 1128, 1137 (9th Cir. 2019). "There are, however, two critical exceptions to this rule: (1) when the agency violates a regulation promulgated for the benefit of petitioners and that violation prejudices the petitioner's protected interests; and (2) when the agency egregiously violates a petitioner's Fourth Amendment rights." *Sanchez*, 904 F.3d at 649 (internal citations omitted).

Under the Supreme Court's ruling in *INS v. Lopez-Mendoza*, evidence of alienage is admissible if it is obtained independently of, or sufficiently attenuated from suppressible evidence. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1043 (1984); *Sanchez*, 904 F.3d at 653 & n.12. An alien's identity is not suppressible. *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1015 n.5 (9th Cir. 2008). Alienage evidence obtained using only an alien's identity is severed from any violation that may otherwise justify exclusion.

When reviewing whether evidence is tainted by a suppressible violation in the criminal sphere, we employ a burden-shifting framework. In that context, "[i]nitially, the defendant who shows that he was the victim of an unconstitutional search must go forward with specific evidence demonstrating taint. The burden then shifts to the government to show that it acquired its evidence from an independent source." *United States v. Cella*, 568 F.2d 1266, 1284–85 (9th Cir. 1977) (citations omitted). We adapt that framework for our purposes here. Applied to the limited instances in which we recognize the availability of the exclusionary rule in immigration proceedings, if an alien establishes a prima facie case of an egregious regulatory or Fourth Amendment violation warranting suppression, the alien is then charged with providing specific evidence that each piece of allegedly suppressible government evidence is

tainted by that unlawful act. Upon that showing, the burden then shifts to the government to contest the alien's specific evidence of taint or otherwise show the government's allegedly tainted evidence is immune from suppression, including a demonstration that the evidence was obtained independently of or is sufficiently attenuated from the underlying unlawful act or evidence obtained therefrom.

Here, the IJ assumed for purposes of analysis that the information in the I-213s was obtained in violation of federal regulations or B.R.'s constitutional rights. But DHS submitted supplemental evidence of alienage not at issue in B.R.'s motion to suppress the I-213s. To suppress DHS's supplemental evidence, B.R. had the initial burden to demonstrate it was tainted by DHS's unlawful act. But the IJ acted out of turn. The IJ addressed whether the supplemental alienage evidence was obtained independently of the claimed unlawful act or of the I-213s before B.R. moved to suppress the supplemental evidence based on taint. The decision preemptively to find evidence to be independent of an alleged suppressible violation may be a valid course of action in some circumstances, but if the IJ is later presented with information contrary to IJ's assumptions, the IJ is required to give that evidence reasoned consideration.

B.R. subsequently presented specific evidence in his motion to reconsider that at least the birth certificate was not obtained independently of tainted evidence but was itself the product of tainted evidence. According to B.R.'s evidence, DHS could not have obtained the birth certificate without using at least some of the information available to DHS only in B.R.'s confidential juvenile court record, to wit his date of birth, the Mexican state in which he was born, his parents' names, etc. That is specific evidence of taint, yet nothing in

the record indicates that the agency seriously considered this evidence. Instead, it appears the agency arbitrarily ignored it and found the government's evidence free from taint. That is error and an abuse of discretion. *Cole v. Holder*, 659 F.3d 762, 772 (9th Cir. 2011) ("[W]here potentially dispositive testimony and documentary evidence is submitted, the [agency] must give reasoned consideration to that evidence.").

We are unable to conclude, based on the existing record evidence, that DHS obtained the birth certificate based on B.R.'s identity evidence alone.[11] DHS's certified account as to how it obtained B.R.'s birth certificate—stating that the ICE officer obtained it by inputting B.R.'s "biographical information" into the Consulate General of Mexico website—is insufficient to rebut B.R.'s evidence of taint. The ICE officer's certificate did not reveal which biographical information he used or where and how that information was obtained. If ICE located the birth certificate by using information gleaned from B.R.'s juvenile records or his I-213s, it would not be free from the taint of that alleged suppressible violation. If ICE used only his name, or used information obtained in its interview with B.R., then DHS has the burden on remand to demonstrate just that with sufficient detail to allow the IJ to verify that the evidence does not constitute fruit of unlawful government conduct.

---

[11] We do not fault DHS. In supplementing its alienage evidence, DHS was responding to B.R.'s motion to suppress the I-213s. At that point, there was as yet no contention that the birth certificate and presentence investigation report were tainted. DHS's statements accompanying the supplemental documents are taciturn and concerned primarily with authenticating the documents, not with establishing that they were obtained independently of B.R.'s juvenile court records.

Because "[a] successful prima facie showing of a regulatory violation for evidentiary suppression purposes . . . normally entitle[s] the petitioner to a remand for the government to rebut the petitioner's showing," *Sanchez*, 904 F.3d at 653, we remand with instructions to afford DHS the opportunity to rebut B.R.'s evidence of taint.[12] We recognize that we have yet to plot out precisely what information about a person qualifies as his "identity." Certainly, at least, the person's name. But certainly not his place of birth. *Perez Cruz*, 926 F.3d at 1136. To the extent necessary, the agency may examine in the first instance the finer grains of this issue as it relates to DHS's supplemental evidence.

We note, however, that B.R. never satisfied his burden to submit specific evidence that DHS's presentence investigation report was tainted. The presentence investigation report was created by a probation officer following B.R.'s methamphetamine conviction and appears to be attenuated from any alleged unlawful act on the part of ICE or DHS. "The law of this Circuit is that there is no sanction to be applied when an illegal arrest only leads to discovery of the man's identity and that merely leads to the official file or other independent evidence. The file can be used so far as relevant." *United States v. Orozco-Rico*, 589 F.2d 433, 435 (9th Cir. 1978) (internal quotation marks and citation omitted). B.R.'s conviction is a matter of public record and information contained within that official file is per se independent of any suppressible violation committed

---

[12] Because we remand on the merits, we need not resolve B.R.'s contention that he was deprived of a reasonable time to review DHS's supplemental evidence and was denied due process. *See Lo v. Ashcroft*, 341 F.3d 934, 937 & n.3 (9th Cir. 2003) (abstaining from addressing petitioner's due process argument after granting petition on the merits).

pursuant to unrelated immigration proceedings. B.R. has not provided any evidence that DHS uncovered his federal conviction by using information obtained from B.R.'s unrelated California state juvenile criminal record.

Even so, we have serious misgivings as to the propriety of the admission of the presentence investigation report that should be addressed on remand, including how DHS obtained the presentence investigation report when it was placed under seal by the federal district court. Given these misgivings and the fact that the agency relied on both the birth certificate and the presentence investigation report in determining that DHS's evidence was sufficient to establish alienage, we refrain from concluding in the first instance that the presentence investigation report alone is sufficient to establish B.R.'s alienage. *INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam).

We grant the petition for review and remand for the agency to reopen proceedings consistent with this opinion, including, if necessary, examining the merits of B.R.'s motion to suppress the I-213s.[13]

## C. Convention Against Torture

Finally, in the interest of judicial economy, we examine the agency's denial of B.R.'s application for protection under CAT in the event the government is able to prove

---

[13] B.R. also argues that termination under *Sanchez* is required due to DHS's unlawful treatment of his confidential juvenile records and that the agency ignored this argument. B.R. has not yet proven DHS committed any egregious regulatory violation or abridgment of his fundamental rights and he is not entitled to termination at this juncture. *Sanchez*, 904 F.3d at 655–56. He may renew this argument on remand if he so desires.

B.R.'s alienage on remand. B.R. attacks a number of the agency's legal and factual findings including, most crucially, the finding that B.R. failed to demonstrate any torture he is likely to suffer would occur with the acquiescence of the Mexican government or its officials. We conclude substantial evidence supported the agency's finding and deny the petition as to relief from removal.

In denying B.R. deferral of removal under CAT, the agency found that B.R. "failed to show that the Mexican government would acquiesce to the torture he fears," an essential element to obtaining CAT relief. B.R. argues that this factual conclusion lacked substantial evidence for two main reasons. First, he argues that because American law enforcement officers have profiled B.R. as a gang member due to his tattoos (although B.R. stated he was profiled primarily "based on the people [he would] hang out with"), Mexican law enforcement might similarly profile him as a gang member and might torture him as a result. Second, he argues that the Mexican government sometimes colludes with cartels and is generally ineffective in deterring and prosecuting crime.

CAT protection cannot be granted unless an applicant shows a likelihood of torture that "is inflicted by or at the instigation of or with the consent or acquiescence of a public official acting in an official capacity or other person acting in an official capacity." 8 C.F.R. § 208.18; *Arrey v. Barr*, 916 F.3d 1149, 1160 (9th Cir. 2019). "[A] government does not acquiesce in the torture of its citizens merely because it is aware of torture but powerless to stop it." *Garcia-Milian v. Holder*, 755 F.3d 1026, 1034 (9th Cir. 2014) (citation omitted). Evidence of future acquiescence by public officials should be sufficiently related to the sources of petitioner's likely torture. *Parada v. Sessions*, 902 F.3d 901,

916 (9th Cir. 2018) ("[T]he acquiescence standard is met where the record demonstrates that public officials . . . would acquiesce in torture the petitioner is likely to suffer."). For example, if the torture is likely to arise from violence by the Mara Salvatrucha ("MS-13") gang, the evidence must show public officials acquiesce in gang or specifically MS-13 torture. *See id.* at 915–16. If torture is likely to arise from an alien's uncle over a prior land dispute, then evidence of acquiescence must show public officials acquiesce in their citizens torturing or killing each other over personal grudges or property disputes. Generalized evidence of violence in a country is itself insufficient to establish that anyone in the government would acquiesce to a petitioner's torture. *See Delgado-Ortiz v. Holder*, 600 F.3d 1148, 1152 (9th Cir. 2010).

First, B.R.'s assertion that Mexican authorities themselves might torture him because they might believe his tattoos are gang related—despite the fact that he testified that his tattoos are not gang related—is, on this record, pure speculation. *Blandino-Medina v. Holder*, 712 F.3d 1338, 1348 (9th Cir. 2013). Second, he makes no effort to provide evidence that Mexican authorities would acquiesce to his torture at the hands of his uncle.

Finally, the agency's conclusion that B.R. failed to prove that the Mexican government would acquiesce in his torture at the hands of either the La Familia Michoacána drug cartel or the New Generation Jalisco Cartel is supported by substantial evidence. B.R. did not cite any direct evidence that the Mexican government or local Mexican officials are aware of and have acquiesced in any cartel plan to torture B.R. *See Zheng v. Ashcroft*, 332 F.3d 1186, 1194–95 (9th Cir. 2003). Instead, he relies only on generalized country reports and news clippings. The agency examined these

reports and reasonably concluded that they do not establish that anyone in the Mexican government would acquiesce to B.R.'s torture. Indeed, upon our own inspection, these reports suggest that, while on occasion some corrupt officials may turn a blind eye to cartel activity, the Mexican government, rather than being willfully blind to cartel violence and torture, actively combats and prosecutes cartel activity. While these troubling reports describe senseless, abhorrent violence throughout Mexico and a demoralizing ineffectiveness on the part of the Mexican government's genuine efforts to free its citizens from this terror, they do not prove that the Mexican government would acquiesce in the torture of its citizens at the hands of cartels. *See Andrade-Garcia v. Lynch*, 828 F.3d 829, 836 (9th Cir. 2016) ("[A] general ineffectiveness on the government's part to investigate and prevent crime will not suffice to show acquiescence.").

Nothing in the record would compel a reasonable adjudicator to conclude that the Mexican government would acquiesce in B.R.'s torture. Because B.R. failed to satisfy this essential element, he is ineligible for CAT protection, and we need not address his remaining assignments of error. His petition for review as to his application for CAT protection is denied.

## IV.  CONCLUSION

For the reasons outlined above, the petition for review is **GRANTED in part; DENIED in part; and REMANDED** for further proceedings consistent with this opinion.